492 So.2d 83 (1986)
Raymond E. DAY
v.
J. RAY McDERMOTT, INC.
No. 85-CA-0138.
Court of Appeal of Louisiana, First Circuit.
June 24, 1986.
Writ Denied October 10, 1986.
*84 Danny J. Lirette, Houma, for plaintiff-appellant-third appellant Raymond E. Day.
John Nesser and Co-Counsel, Patricia Krebs, New Orleans, for defendant-appellant-first appellant J. Ray McDermott, Inc.
Michael F. Grennan, New Orleans, for third party defendant Ultrasonic Specialists, Inc., appellee.
Brian L. Reboul, Metairie, for intervenor-appellant-second appellant American Mut. Liability Ins. Co.
Before EDWARDS, LANIER and JOHN S. COVINGTON, JJ.
EDWARDS, Judge.
Gulf Oil Company contracted with McDermott, Incorporated to construct an offshore platform at McDermott's yard in Amelia, Louisiana. Gulf then hired Ultrasonic Specialists, Inc., (USI) to serve as an independent inspector of the welds made by McDermott's employees. McDermott required that USI, in order to gain admittance to the work area, had to execute a hold harmless agreement in McDermott's favor covering USI's employees. Raymond E. Day, while in the course of his work as a technician for USI, fell from a scaffold in the yard, suffering multiple injuries.
Day sued McDermott for damages due to negligence. McDermott, by way of third party petition, sued USI under the hold harmless agreement. American Mutual Liability Insurance Company (American Mutual) intervened to recover workmen's compensation payments which it made on Ultrasonic's behalf to Raymond Day.
In a non-jury trial held in March, 1984, the court found Day and McDermott each to have been 50% at fault. It awarded Day a total judgment of $298,988.00, which was in turn reduced by half, giving him an actual recovery of $149,494.00. The court granted summary judgment to USI on McDermott's third party petition and awarded American Mutual an amount which was less than the total paid in workmen's compensation. With the exception of USI, all parties appealed.

NEGLIGENCE
The record shows that plaintiff had considerable discretion in his work. He chose the welds he would inspect, as well as when and how he would inspect them. He was unsupervised by the McDermott people, dealing with them only if he needed assistance. The McDermott people, on the other hand, kept their distance in deference to Mr. Day's independent status. Thus, when plaintiff decided to check certain overhead welds on an upper deck of the *85 platform, he needed no clearance from anyone.
There were two ways available to plaintiff to reach the welds. He could climb the permanent scaffold which was attached to the platform itself, or he could use temporary scaffolding which was generally available where construction was in progress. The testimony shows that on this particular occasion it was less convenient for Mr. Day to use the permanent scaffolding.
He found a temporary scaffold nearby and began to climb it. Unknown to Mr. Day, this scaffold had been designated to be disassembled. McDermott's employees had removed the bands securing the boards to the frame, but they had not yet taken the scaffold down. When Mr. Day reached the top, the unsecured boards moved from under him, causing him to fall ten feet to the deck below.
Testimony showed that the scaffold had sat there in that condition for several days. No McDermott employees had used it, because of a company rule which prohibited the use of scaffolding on which the boards were not secured. There was also testimony that no one had informed plaintiff of this rule, due to his independent status. It was further shown that the scaffold had been placed in such a position that it was too far from the platform to be useful. In this connection, plaintiff admitted he was only trying to look at the welds from a distance and not to test them. Finally, plaintiff testified he had not examined the scaffold to determine its condition before he climbed it.
On appeal, plaintiff asserts a responsibility on the part of McDermott for defective things under LSA-C.C. Art. 2317, and a duty to use reasonable care under Art. 2315. Defendant, on the other hand, contends Art. 2317 does not apply because there was no defect. It claims there was no defect because of the rule, known to McDermott employees, that scaffolds were not to be used if the boards were not tied down. Thus it was misuse by plaintiff, defendant argues, and not a defect in the thing, which caused his damage. Stine v. Creel, 417 So.2d 1243 (La.App. 3d Cir.1982), writ denied, 422 So.2d 163 (La.1982).
The trial court agreed that there was misuse by plaintiff, but held the scaffold had been left in a dangerous condition. The court ruled further that Civil Code Article 2317 did not apply, thus relegating recovery to Article 2315, which says:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
We agree with the court. The scaffold was not defective, but it was dangerous. McDermott's own rule prohibited the use of scaffolding in the very condition of the one on which plaintiff was injured. Since they recognized this danger, McDermott's employees should not have left the scaffold standing for several days without placing a warning sign upon it. They should have left it safe to use, completed their disassembly, or given warning of its condition.
It can hardly be argued, however, that plaintiff was without fault. He made no inspection of the scaffold before he climbed it. We agree, therefore, with the trial court's finding that plaintiff's fault was equal to defendant's fault. The award was correctly decreased by 50%.

AMOUNT OF THE AWARD
The trial judge calculated plaintiff's total damages as follows:

 Pain and Suffering $ 45,000.00
 Permanent Disability 50,000.00
 Past Wage Loss 81,988.00
 Future Wage Loss 100,000.00
 ___________
 $276,988.00

Plaintiff suffered multiple rib fractures, an open fracture of the left elbow, a closed fracture dislocation of the left shoulder, and a torn fracture of the left pelvic bone. He was under intensive care for three days while doctors performed surgery to repair the fracture sites. The accident occurred on February 9, 1982, and plaintiff was treated until the following December. At that time it was determined that he had *86 reached his maximum improvement. He was told he could not return to any work requiring him to climb, reach, or lift overhead.
Mr. Day received further treatment in March, 1983, and was intermittently under doctor's care until January 16, 1984, when he was discharged. He was found to have a permanent physical impairment of the left upper extremity of 40%, which was translated to be 24% of the whole man. Mr. Day was told not to lift any weight over fifty pounds, in addition to the avoidance of climbing, pulling, and overhead work.
These injuries effectively took plaintiff out of the ultrasonic testing business. The record shows there were no field positions for a man who could not climb or lift. It was, however, established that he could work in a lab or as a supervisor, but it was also shown that very few such jobs exist.
Until his accident, Mr. Day had a bright future. The record indicates he was an above average earner and could have continued making between $35,000.00 and $40,000.00 yearly. Expert testimony placed his lost future earnings at about $500,000.00, based on a work life expectancy of 18.5 years.
Plaintiff made a reasonable effort to find work in ultrasonic testing. He then consulted a job counselor and, after evaluation by the counselor, Mr. Day returned to college to study business and computer science. The trial judge wrote in his reasons for judgment:
... This constitutes a career change. The court is not convinced from the totality of the evidence that the plaintiff could not stay in his same field of employment even with his disability. While the job opportunities might be more restricted he could still do better there than in his proposed new career. He can not expect to be compensated for choosing a new career. (Emphasis added)
The plaintiff contends the award for loss of future earnings of $100,000.00 is too low. We agree.
Our review of the record indicates that the trial court was clearly wrong in determining as a fact that the plaintiff as a practical matter, was capable of working in his same field of employment with his disability. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The testimony shows (1) that ultrasonic testing is a climbing, lifting, overhead job; and (2) that plaintiff's employment prospects were remote at best. To label his opportunities as "more restricted" is to severely understate his situation. The facts shown in this record are that, as an ultrasonic technician, Mr. Day was totally unemployable in the field and only theoretically employable in the lab, where there are very few jobs. Indeed, the president of Ultrasonic Specialists, Inc., testified that he maintained no permanent lab positions but brought technicians in from the field as needed. This factual error has produced, in part, an abuse of discretion in fixing the loss of future wages award.
Awards for loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the court must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and which do not work an injustice on either party. Robinson v. Graves, 343 So.2d 147 (La.1977); Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984). A loss of future income award is not merely predicated upon the difference between a plaintiff's earnings before and after a disabling injury. Such an award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Loss of future income awards thus encompass the loss of a plaintiff's earning potentialthe loss or reduction of a person's capability to do that for which he is equipped by nature, training, and experience and for which he may receive recompense. Coco v. Winston Industries Inc., 330 So.2d 649 (La.App. 3d Cir.1975); Naylor v. La. Dept. of Public Highways, 423 So. *87 674 (La.App. 1st Cir.1982), writs denied, 427 So.2d 439, 429 So.2d 127, 134 (1983).
In determining an injured person's net economic loss caused by impairment of earning capacity, one of the factors to be considered is the availability of reasonable employment opportunities for which the claimant is suited by education, experience and physical capacity. Dunaway v. Rester Refrigeration Service, Inc., 428 So.2d 1064 (La.App. 1st Cir.1983), writs denied, 433 So.2d 1056, 1057 (La.1983). Other facts which may be considered in fixing awards of impairment of earning capacity are age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and the inflation factor. Unbehagen v. Bollinger Workover, Inc., 411 So.2d 507 (La.App. 1st Cir.1982). However, before an appellate court can disturb a quantum award, the record must clearly reveal that the trier of fact abused its discretion in making the award. An award made by the trial court may not be modified unless it is unsupported by the record. The appellate question is not whether a different award may have been more appropriate, but whether the trial court's award can be reasonably supported by the record. Coco v. Winston Industries, Inc., supra; Black v. Ebasco Services, Inc., 411 So.2d 1159 (La. App. 1st Cir.1982), writ denied, 414 So.2d 1253 (La.1982). Moreover, the appellate function in reviewing quantum is limited to raising inadequate awards to the lowest amount the trial court could have reasonably awarded, and lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., supra.
We hold that a more reasonable result is warranted by the testimony and the evidence. Taking into account plaintiff's permanent disability and the expert's figures, the award should be $200,000.00. Accordingly, we amend the trial court's judgment and award plaintiff $200,000.00 for future lost wages due to his injuries. This raises the total judgment from $298,988.00 to $398,988.00, which is in turn decreased by 50% for a total award of $199,494.00. In all other respects the court's money judgment was without error.

THE ANTI-INDEMNITY ACT
Defendant assigns error to the trial court's granting summary judgment on the third party petition for indemnity under McDermott's hold harmless agreement with USI. The court held the agreement void under provisions of the Louisiana Anti-Indemnity Act, LSA-R.S. 9:2780, which prohibits such contracts. McDermott argues that the Act does not apply to this particular agreement because platform construction is too remote in relation to drilling for oil.
The judge said, "While the court admires the ingenuity of McDermott's counsel, the application of simple everyday common sense leads one to the unavoidable conclusion that this is exactly the type activity the act covers." The court then quoted subsection C, adding its own emphasis as follows:
The term `agreement', as it pertains to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, as used in the Section, means any agreement or understanding, written or oral, concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, including, but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or excavating, constructing, improving or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, *88 or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

We agree with the court. The Legislature could hardly have drawn the Act any broader. Surely the words "... or other structure intended for use in the exploration for or production of any mineral" would include a drilling platform. The terms "testing" and "constructing" are specifically mentioned, thus covering the activities involved in this lawsuit.
McDermott contends alternatively that even if the Act does apply, it is unconstitutional. This question has been decided to the contrary. The Act was held constitutional in Aucoin v. Pelham Marine, Inc., 593 F.Supp. 770 (W.D.La.1984). Nor does it violate equal protection rights. Bryant v. Platform Well Service, Inc., 563 F.Supp. 760 (E.D.La.1983). Bryant also held that the Act was not a "special law" within the meaning of the La. Const. of 1974, art. III, § 12, on grounds it singled out the oilfield industry for special treatment.
We conclude, therefore, that the court was correct in dismissing the third party petition by summary judgment.

STATUTORY EMPLOYER DEFENSE
McDermott contends that it was plaintiff's statutory employer under LSA-R.S. 23:1061 and should therefore enjoy immunity from suit in tort. For the statute to apply, however, there must have been a contract between McDermott and Ultrasonic Specialists, Inc., for the work being done by plaintiff. See Lewis v. Exxon Corporation, 441 So.2d 192 (La.1983). No such contract was introduced. Indeed, the record shows conclusively that USI was working for Gulf as an independent tester of McDermott's welding. This defense was not successfully proved.

INTERVENOR'S CLAIM
American Mutual was workmen's compensation insurer for Ultrasonic Specialists, Inc., plaintiff's employer. It intervened in the suit to recover compensation benefits paid to plaintiff under its policy. Total payments amounted to $40,608.95, but the court reduced the claim by 20% and awarded $32,487.16. The 20% reduction was to represent intervenor's pro rata share of costs and attorney's fees for plaintiff. American Mutual assigns error and brings this appeal to recover full reimbursement.
Intervenor correctly relies on the first paragraph of LSA-R.S. 23:1103, which reads as follows:
In the event that the employer or the employee or his dependent becomes party plaintiff in a suit against a third person, as provided in R.S. 23:1102, and damages are recovered, such damages shall be so apportioned in the judgment that the claim of the employer for the compensation actually paid shall take precedence over that of the injured employee or his dependent; and if the damages are not sufficient or are sufficient only to reimburse the employer for the compensation which he has actually paid, such damages shall be assessed solely in his favor; but if the damages are more than sufficient to so reimburse the employer, the excess shall be assessed in favor of the injured employee or his dependent, and upon payment thereof to the employee or his dependent, the liability of the employer for compensation shall cease for such part of the compensation due, computed at six per cent per annum, and shall be satisfied by such payment.
There is no provision in the statute for the employee to recover his attorney's fees or costs from an intervenor's award. Accordingly, we amend the judgment of the trial court to provide American Mutual full recovery of the $40,608.95 which it paid plaintiff in compensation benefits.
Costs are taxed to defendant.
*89 AFFIRMED IN PART, AMENDED IN PART, AND RENDERED.