United States Court of Appeals,

Fifth Circuit.

No. 96-30026.

Cynthia E. ROBERTS, etc., et al., Plaintiffs,

v.

ENERGY DEVELOPMENT CORP., et al., Defendants, Third Party Plaintiffs Appellants-Cross Appellees,

v.

TEST, INC., formerly Production Management Control Systems, Inc., et al., Third Party Defendants, Appellees-Cross Appellants.

Feb. 4, 1997.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before WISDOM, DAVIS and DUHÉ, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Appellants, Energy Development Corporation ("EDC") and Grasso Production Management Inc. ("Grasso"), challenge the district court's judgment denying its indemnity claim against its contractor Production Management Control Systems ("PMCS") under a master service agreement. We vacate the judgment and remand for further proceedings.

I.

PMCS is a Louisiana oilfield contractor engaged in providing and maintaining pneumatic safety systems for offshore production platforms. EDC is an oil and gas production company, which holds state leases on a number of offshore production fields, including the "Chevron Field" under consideration in this case. Grasso was hired by EDC to operate and maintain EDC's production platforms in that field. EDC and PMCS entered into a master service agreement ("Agreement") under which PMCS agreed to provide EDC with its services as requested by EDC. A choice-of-law provision in the Agreement provided that the general maritime law and Texas law would govern. The Agreement also included indemnity provisions which required PMCS to indemnify EDC and Grasso against liability for any injury suffered by PMCS employees even though caused by EDC's fault.

Pursuant to the Agreement, EDC, through Grasso, issued an oral work order to PMCS to install safety systems on EDC's platforms in the "Chevron Field." PMCS dispatched Kerry Roberts to perform the work. The work order provided for the installation of two safety systems: a level safety high system ("LSH") which is designed to prevent the tank from overflowing onto the platform and a "fire loop" fire safety system. The LSH system is designed to activate when monitors indicate the contents of the oil storage tank have reached an unsafe level. To prevent the wells from continuing to flow and feed oil into the tank, the system shuts down the platform's compressor which pumps "lift gas" into the wells. Without this infusion of "lift gas", the wells stop production. The "fire loop" system operates in a similar manner. If the heat sensors perceive a fire, the safety system shuts down the "lift gas" compressor so that the wells stop producing and do not feed the fire.

At the time of his death, Mr. Roberts was working on EDC's E-5 production platform which is located in Louisiana waters. He was installing a "fire loop" system on the top of an oil storage tank filled with oil. The metal on the top of the tank where he was standing failed. As a result, he fell into the tank and drowned. Mr. Roberts' survivors sued both EDC and Grasso. EDC and Grasso then filed a third party complaint against PMCS seeking indemnification pursuant to the Agreement. PMCS sought summary judgment on grounds that the indemnification provision in the Agreement was void under the Louisiana Oilfield Indemnity Act ("LOIA").[1] EDC and Grasso filed a cross motion for summary judgment seeking a determination that the indemnity obligation was enforceable. Mr. Roberts' family settled with EDC and Grasso thus leaving only the indemnity issue to be resolved. The district court found the LOIA applicable to the Agreement and also found that the LOIA voided the Agreement's choice-of-law provision. The court granted summary judgment in favor of PMCS and denied EDC and Grasso's indemnity claim. This appeal followed.

II.

This appeal presents two legal issues for resolution. First, whether the LOIA applies to the Agreement. Second, whether the Agreement's choice-of-law provision is enforceable. We review this grant of summary judgment under the same standard that guided the district court. *Lloyds of*

---

[1]La.Rev.Stat.Ann. § 9:2780 (1991).

*London v. Transcontinental Gas Pipe Line,* 38 F.3d 193, 196 (5th Cir.1994).

A.

The LOIA was enacted generally to protect Louisiana oilfield contractors from over reaching principals who force the contractors through indemnity agreements to bear the risk of the principal's negligence. La.Rev.Stat.Ann. § 9:2780 (1990);[2] *Rodrigue v. Legros,* 563 So.2d 248, 255 (La.1990); *Torres v. McDermott, Inc.,* 12 F.3d 521, 526 (5th Cir.1994). The LOIA therefore nullifies indemnity agreements which protect the principal against its own fault at the expense of the contractor if the indemnity provisions are part of an agreement pertaining to an oil or gas well. La.Rev.Stat.Ann. § 9:2780(A) (1991). The LOIA is broadly written and has been broadly interpreted by the Louisiana courts and this Court. See *Copous v. ODECO Oil & Gas,* 835 F.2d 115, 117 (5th Cir.1988); *Broussard v. Conoco, Inc.,* 959 F.2d 42, 45 (5th Cir.1992); *St. Amant v. Glesby-Marks Corp.,* 532 So.2d 963, 965 (La.Ct.App. 5th Cir.1988).

Turning to today's case, the LOIA by its terms applies to the work order[3] authorizing Robert's work if the order "pertains to a well" and is "related to the "exploration, development, production or transportation of oil, gas, or water.' " *Johnson v. Amoco Production Co.,* 5 F.3d 949, 953-54 (5th Cir.1993). EDC and Grasso's only challenge to the applicability of the LOIA is that the work order does not "pertain to a well." This inquiry requires a fact intensive case-by-case analysis. *Transcontinental Gas v. Transportation Insurance Co.,* 953 F.2d 985, 994 (5th Cir.1992); *Broussard,* 959 F.2d at 44.

---

[2]The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells.... It is the intent of the legislature by this Section to declare null and void and against the public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee." La.Rev.Stat.Ann. § 9:2780(A) (1991).

[3]The oral work order is the relevant agreement for determining this issue. See *Johnson v. Amoco Production Co.,* 5 F.3d 949, 952 (5th Cir.1993). The work order apparently called for systems to be installed on three platforms, E-8, W-8, and E-5; this opinion, however, will focus on the work done on the E-5 platform, where Roberts died. See *Lloyds of London,* 38 F.3d 193, 197 (holding that "[t]he fact that the contract also may pertain to numerous other wells or to objects other than wells is of no consequence").

EDC and Grasso argue that the work order does not "pertain to a well" because the E-5 platform serviced and received the products of six wells. Our decision in *Broussard* controls this issue. In *Broussard,* we held that a catering contract requiring the contractor to feed the production workers and maintain their living quarters on a quarters platform located adjacent to a production platform pertained to a well. We reached this conclusion despite the fact that these workers served multiple wells from the platform. We concluded that the "purpose or function of the facilities covered by the contract was to sustain manpower for production." *Broussard,* 959 F.2d at 45. We stated that a " "functional nexus' arises from the fact that production employees are unquestionably necessary for production from a well." *Id.* See Also *Copous,* 835 F.2d at 117 (holding the LOIA applied to a contract to renovate living quarters on a manned platform because the living quarters "were essential to the operation" of the platform, and the platform was an integral part of the drilling operation).

The safety systems called for in EDC's work order protect the E-5 platform and personnel working there by stopping the production of the wells feeding the platform in certain emergencies. Significantly, the E-5 platform housed workers who helped maintain the six wells. Therefore, the safety systems called for in the work order—like the catering done in *Broussard*—sustain the manpower necessary for production. The safety systems, by protecting the equipment on the E-5 platform, provide an additional nexus to the wells. The systems sustain the equipment necessary for production.

EDC and Grasso argue next that this Court's decisions in *Transcontinental Gas, Johnson* and *Lloyds of London* require a conclusion that this work order did not "pertain to a well." In *Transcontinental Gas,* this court considered whether a contract pertained to a well when the contractor provided painting, sandblasting, and other services to a pipeline and related transmission equipment. We rejected the indemnitor's argument that their work pertained to a well because it was performed on the transmission pipeline and equipment. The court held that there is a "point at which the gas no longer can be identified with a particular well, or is so fundamentally changed in processing, commingling, or preparing it for distribution to its ultimate end user, that the gas no

longer "pertains to a well.' "[4]  *Transcontinental Gas,* 953 F.2d at 994.  Identifying this "point" is important under *Transcontinental Gas* because work called for in a contract to service transmission equipment transporting gas downstream from this point is not considered work that "pertains to a well."  *Transcontinental Gas,* however, is most relevant in a case where the contract provides for work to be performed to a pipeline or other part of the transmission system and where that work has little, if any, connection to the wells themselves.[5]

Relying on *Transcontinental Gas* and its progeny, EDC and Grasso argue that because Roberts was working on a tank holding commingled oil, his work did not pertain to a well.  The flaw in EDC and Grasso's argument is the insistence that we focus solely on the location of the work being performed at the time of the accident and the condition of the oil at that location.  *Broussard* teaches that where the contract calls for work necessary to sustain the crew who work on individual wells,

---

[4]We recited the following factors to assist courts in making this determination:

> (1) whether the structures or facilities to which the contract applies or with which it is associated, e.g., production platforms, pipelines, junction platforms, etc., are part of an infield gas gathering system;  (2) what is the geographic location of the facility or system relative to the well or wells;  (3) whether the structure in question is a pipeline or is closely involved with a pipeline;  (4) if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities;  (5) whether the pipeline is a main transmission or trunk line;  (6) what is the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like;  (7) what is the purpose or function of the facility or structure in question;  (8) what if any facilities or processes intervene between the wellhead and the structure or facility in question, e.g., "heater treaters," compressor facilities, separators, gauging installations, treatment plants, etc.;  (9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question;  (10) any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.

*Transcontinental Gas,* 953 F.2d at 994-95.

[5]*Johnson* and *Lloyds of London* are indistinguishable in principle from *Transcontinental Gas.* In all those cases the work to be performed under the contract was on a pipeline or pipeline equipment that transported commingled gas from the platform to shore.  EDC and Grasso also rely on language in these cases that suggests that a contract does not "pertain to a well" if it calls for services on multiple wells that are not directionally drilled.  We do not read these cases as necessarily excluding contracts from LOIA's scope where the contracts relate to multiple wells served by the platform or group of platforms simply because the wells were not directionally drilled.

the required nexus to a well is established. Here, the purpose of the safety system Mr. Robert's was installing pursuant to PMCS' contract was to preserve the manpower and facilities of production. In an emergency, the wells themselves are shut down. This nexus is strong enough, given the broad scope of the LOIA, to conclude that the work order "pertains to a well." Accordingly, we fully agree with the district court's conclusion on this issue.

## B.

We turn now to EDC's argument that the district court erred in concluding that the Agreement's choice-of-law provision is nullified by the LOIA. Both parties agree that if the choice-of-law provision is enforceable, the Agreement's indemnification provisions are enforceable under both Texas law and the general maritime law. On the other hand, given our holding that the Agreement "pertains to a well," if the choice-of-law provision is voided and Louisiana law applies, the indemnification provisions are nullified by the LOIA. Thus, as the district court recognized, EDC and Grasso must prevail on this issue if they are to obtain indemnification.

In analyzing whether to enforce the choice-of-law provision, the district court held that *Matte v. Zapata Offshore Co.,* 784 F.2d 628 (5th Cir.1986) was dispositive. The court interpreted *Matte* as requiring the court to void the Agreement's choice-of-law provision if the LOIA applied to the Agreement. We do not read *Matte* so broadly. In *Matte,* the accident and injury occurred on the Outer Continental Shelf rather than Louisiana waters, where Mr. Robert's accident occurred. The Outer Continental Shelf Lands Act therefore required the application of Louisiana law, including the LOIA, in *Matte.* See *Union Texas Petroleum Corp. v. PLT Eng'g Inc.,* 895 F.2d 1043, 1047 (5th Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990) ("It is beyond any doubt that the OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision to the contrary"). Because the OCSLA, which essentially acts as a choice-of-law trump card, is inapplicable here, *Matte* is inapposite and we must turn to the Louisiana conflicts articles to determine whether the choice-of-law provision is enforceable.

In federal diversity cases the conflicts law of the forum state, here Louisiana, governs.

*Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under

the Louisiana conflicts articles, we look first to Article 3540 which states:

> All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

La.Civ.Code art. 3540.

Thus, we next turn to Article 3537 to determine which state law would otherwise be

applicable to the Agreement. Article 3537 states:

> Except as otherwise provided in this Title, an issue of conventional obligation is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant polices of the involved state in light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the polices referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

La.Civ.Code art. 3537.

Article 3515 guides us in balancing the policies of the states:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international system, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La.Civ.Code art. 3515.

The Revision Comments to articles 3515 and 3537 provide helpful instructions to courts using

these articles. The Comments emphasize that the objective of the choice of law analysis is to "identify

"the state whose policies would be most seriously impaired if its law is not applied to that issue.' "

La.C.C. art . 3515 (1991 revision comments (a)). The Comments to article 3537 list two steps to

follow in making this determination. The first is to identify " "the relevant policies of the involved

states.' "  The next step is to evaluate " "the strength and pertinence of [these] policies' in light of" the three factors listed in the second paragraph of article 3537.  La.C.C. art. 3537 (revision comments 1991 (d)).

We conclude that we should remand this case to the district court to make the analysis these articles require.  We leave it to the district court's discretion whether it should expand this record before making the analysis.

We therefore vacate the district court's judgment and remand this case to the district court for further proceedings consistent with this opinion.

VACATED AND REMANDED.