**Jessie VERDIN**

v.

**ENSCO OFFSHORE COMPANY**

No. CIV. A. 99–0580.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

June 28, 2000.

---

Robert K. Guillory, Robert K. Guillory & Associates, Lafayette, LA, for Jessei Verdin, plaintiff.

Alan K. Breaud, Breaud & Lemoine, Lafayette, LA, for Ensco Offshore Co.

I. Matthew Williamson, Miller & Williamson, New Orleans, LA, for Centin L.L.C., third–party defendant.

## MEMORANDUM RULING

MELANCON, District Judge.

Before the Court are cross-motions for summary judgment filed by third-party plaintiff ENSCO Offshore Company ("ENSCO") and third-party defendant Centin, LLC ("Centin"). For the following reasons, ENSCO's motion will be denied and Centin's motion will be granted.

### I. Background

The instant motions are the result of plaintiff Jesse Verdin's demand for relief from ENSCO for injuries he allegedly sustained while working for Centin on a construction project to refurbish ENSCO 23, a self-contained fixed platform rig designed to drill and complete oil and gas wells. At the time of the accident, ENSCO was under contract with Amerada Hess Corporation (hereinafter "ENSCO–Amerada Contract") to provide ENSCO 23 and necessary employees to perform work on approximately six wells located at Garden Banks Block 260 located off the coast of Louisiana on the Outer Continental Shelf.

ENSCO 23 was dismantled and located at the Coral Marine fabrication yard in Amelia, Louisiana when the ENSCO–Amerada Contract was executed. In order to facilitate the performance of its obligations under the ENSCO–Amerada Contract, ENSCO entered into the Agreement for the Performance of Goods and Facilities with Centin (hereinafter "ENSCO–Centin Agreement"). Part of this agreement contemplated that Centin would demolish, replace and refurbish the living quarters and galley on ENSCO 23.

On April 8, 1998, Verdin was working on ENSCO 23 pursuant to the ENSCO–Centin Agreement when he allegedly fell over the side of the heliport, thereby injuring himself. Verdin filed suit against ENSCO claiming personal injuries as a result of his accident. Pursuant to a defense and indemnity provision contained within the ENSCO–Centin Agreement, ENSCO filed a third-party complaint against Centin.[1]

---

1. The defense and indemnity language contained within the ENSCO–Centin Agreement calls for Centin's defense and indemnification of ENSCO for claims brought against ENSCO by Centin's employees resulting from either Centin or ENSCO's negligence. This type of

ENSCO asserts that Centin is under an obligation to defend and indemnify EN-SCO in the event that ENSCO is found liable for any injury to Verdin. Both parties filed a motion for summary judgment concerning the enforceability of the defense and indemnity provision. ENSCO contends that the provision is enforceable and Centin contends that the provision is barred by the Louisiana Oilfield Indemnity Act ("LOIA"), La. R.S. 9:2780.[2] Because the parties submitted a joint statement of undisputed facts, the Court is primarily faced with a question of law regarding the enforceability of the indemnity provision in the ENSCO–Centin Agreement.

*II. Summary Judgment Standard*

A motion for summary judgment shall be granted if the pleadings, depositions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th

Cir.1994)(en banc). When a party seeking summary judgment bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if such evidence were uncontroverted at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548.

Once the movant produces such evidence, the burden shifts to the respondent to direct the attention of the court to evidence in the record sufficient to establish that there is a genuine issue of material fact requiring a trial. *Id.* The responding party may not rest on mere allegations made in the pleadings as a means of establishing a genuine issue worthy of trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

agreement calling for defense and indemnity of the indemnitee's own negligence is common in the oil and gas industry.

2. The Act provides in part as follows:

A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals ..., to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.

B. Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals ... is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for

damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C. The term "agreement," as it pertains to a well for oil, gas, or water, or drilling for minerals ...,as used in this Section, means any agreement or understanding, written or oral, concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals ..., including but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or excavating, constructing, improving, or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Little,* 37 F.3d at 1075. If no issue of fact is presented and if the mover is entitled to judgment as a matter of law, the court is required to render the judgment prayed for. Fed.R.Civ.P. 56(c); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Before it can find that there are no genuine issues of material fact, however, the court must be satisfied that no reasonable trier of fact could have found for the non-moving party. *Id.*

### III. Analysis

#### A. Federal Maritime Law vs. State Law

Before the Court can address whether the LOIA is applicable to the ENSCO–Centin Agreement, the Court must first decide whether federal maritime law or Louisiana state law applies to this dispute. The ENSCO–Centin Agreement contained a choice of law provision which provided that the Agreement "shall be interpreted and enforced in accordance with the provisions of the General Maritime Law of the United States." *Joint Statement of Undisputed Facts,* no. 29. If a contract is governed by maritime law, the provisions of the LOIA are inapplicable. *Dupont v. Sandefer Oil & Gas, Inc.,* 963 F.2d 60 (5th Cir.1992). The differences in the application of the two laws is important because under maritime law, the indemnity provision would be enforceable, regardless of whether the same provision would be voidable under the LOIA.[3]

The parties do not dispute that maritime law would not apply absent the contractual choice of law clause in the ENSCO–Centin Agreement. ENSCO 23 is a fixed platform which the jurisprudence has consistently held not to be a vessel. *Sisson v. Davis & Sons, Inc.,* 131 F.3d 555, 557 (5th Cir.1998)("Fixed platforms are not vessels but are properly analogized to islands."). Because the refurbishing work contemplated by the ENSCO–Centin Agreement has no connection to a vessel in navigation, maritime law does not apply by its own force. *Davis & Sons, Inc. v. Gulf Oil Corp.,* 919 F.2d 313, 316 (5th Cir.1990).

■ The parties do, however, disagree over the applicability of maritime law as a result of the choice of law clause in the ENSCO–Centin Agreement. Because the parties have invoked this Court's diversity jurisdiction, the conflicts law of the forum state, here Louisiana, governs. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Roberts v. Energy Development Corp.,* 104 F.3d 782, 786 (5th Cir.1997). Furthermore, the parties concede for purposes of the instant motions that Louisiana law would apply in the absence of the choice of law provision in the contract. Thus, the issue the Court must decide is whether Louisiana conflicts law would recognize the validity of the parties' choice of maritime law.

■ Because the dispute before the Court is one involving a conventional obligation, the Court must look to Title VI of Louisiana's conflicts articles. La. Civ. Code art. 3537–41. Pursuant to La. Civ. Code art. 3540, the parties to a contract are free to choose the law applicable to their relationship, "except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537." La. Civ. Code art. 3540. The ability of the parties to choose the law which will govern their contractual relationship is referred to as "party autonomy." *Id.* "Louisiana permits parties to select the law which will govern their contractual relationship. This right is not absolute, however, and must yield to

---

**3.** The significance of the use of Louisiana versus maritime law to the instant action focuses primarily on the applicability of the LOIA. If the LOIA does not apply, the use of Louisiana or maritime law to determine the validity of the indemnity agreement is irrelevant as both recognize the general rule of contract law that allows a principal to be indemnified against his own negligence so long as that intent is clearly expressed. *Rodrigue v. Legros,* 563 So.2d 248, 254 (La. 1990).

public policy considerations." *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 631 (5th Cir.1986); *see* Revision Comments–1991, La. Civ.Code art. 3540 ("The parties may not, by simply choosing another law, evade the public policy of the state whose law would have been applicable to the issue 'but for' the parties' choice" '.). Although La. Civ.Code art. 3537 would normally provide the appropriate guidance for determining which state's law would otherwise apply in the absence of an effective choice by the parties, the parties concede Louisiana law would apply. Thus, the Court does not have to utilize the procedure set out in the second paragraph of La. Civ.Code art. 3537 to determine "the state whose policies would be most seriously impaired if its law were not applied to that issue." La. Civ.Code art. 3537. The Court need only decide if the parties' choice of maritime law contravenes the public policy of Louisiana pursuant to La. Civ.Code art. 3540.

Instructive on the issue of public policy is the Fifth Circuit's opinion in *Matte,* wherein the court held that a choice of law provision calling for the application of maritime law was void. 784 F.2d 628. In *Matte,* the parties entered into a contract governing mineral production on a fixed platform located on the Outer Continental Shelf ("OCS"). The contract contained a maritime choice of law and indemnity provision similar to the ones at issue in this case. Ostensibly, the parties inserted the maritime choice of law provision to avoid the inevitable ramifications of having the LOIA invalidate their indemnity provision. Recognizing that the LOIA is an expression of the Louisiana Legislature's dissatisfaction with the inequities "foisted upon certain contractors and their employees by the defense and indemnity provisions," the court held that the parties' choice of maritime law violated the public policy of Louisiana. *Matte,* 784 F.2d at 631. "To permit parties to contract around the Oilfield Indemnity Act would reinstate as the norm their unequal bargaining positions, and defeat the purpose of that legislation. We

will not participate in such an obvious end-run of the Louisiana Legislature's effort to improve oilfield safety." *Id.*

Although the *Matte* court appeared to lay down a pre se rule of invalidation for choice of law provisions in the LOIA context, the Fifth Circuit clarified the *Matte* ruling in *Roberts v. Energy Development Corp.,* 104 F.3d 782 (5th Cir.1997). In *Roberts,* the Fifth Circuit recognized the importance of the Outer Continental Shelf Lands Act ("OCSLA") in *Matte* because the OCSLA "essentially acts as a choice-of-law trump card," nullifying choice-of-law clauses in contracts involving mineral operations on the OCS. *Id.* at 786. Because the accident in *Roberts* occurred within Louisiana territorial waters and not on the OCS, the Fifth Circuit remanded the case for a determination of the applicable law under Louisiana's conflict of law articles, including a determination of whether the public policy of Louisiana would be contravened if the parties choice of law were honored. *Id.* at 787.

Applying the above principles to the case *sub judice,* the Court concludes that application of maritime law would contravene the public policy of Louisiana. The jurisprudence interpreting the LOIA is uniform in recognizing the inequities the Act endeavors to rectify. Although there is no indication that the Louisiana Legislature intended for the LOIA to apply when maritime law applied by its own force, there is also no indication that the Legislature intended for parties to contract out of the provisions of the LOIA when their relationships were not even remotely governed by federal maritime law. To recognize the autonomy of parties to subject themselves to maritime law when a dispute is completely void of any "salty flavor" surely does not promote the national policy of enforcing uniform maritime law. *See Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990)(discussing uniformity of maritime law).

Accordingly, the Court finds that the parties' choice of law provision is void and Louisiana law provides the appropriate rule of decision.

## B. Applicability of the LOIA

"Louisiana protects oilfield contractors from oil companies who press for master service contracts requiring contractors to provide indemnification even when the oil company is at fault." *Hodgen v. Forest Oil Corp.*, 115 F.3d 358, 359–360 (5th Cir. 1997). "The LOIA therefore nullifies indemnity agreements which protect the principal against its own fault at the expense of the contractor if the indemnity provisions are part of an agreement pertaining to an oil or gas well." *Roberts v. Energy Development Corp.*, 104 F.3d 782, 784 (5th Cir.1997).

■ When considering the applicability of the LOIA, it is important for a court to keep certain principles of judicial interpretation of statutes in mind. *Fontenot v. Chevron U.S.A., Inc.*, 676 So.2d 557, 562. (La.1996). The "paramount consideration for statutory interpretation is the ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law." *Id.* However, "[w]hen the literal construction of a statute produces absurd or unreasonable results the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result." *Green v.*

*Louisiana Underwriters Insurance Co.*, 571 So.2d 610, 613 (La.1990). Accordingly, a court's task "is to interpret the Anti–Indemnity Act in accordance with the intent of the legislature, keeping in mind the spirit of the law and the avoidance of an absurd or unreasonable result." *Fontenot*, 676 So.2d at 567.

■ To determine the applicability of the LOIA, courts employ a two-part test. *See Transcontinental Gas v. Transportation Insurance Company*, 953 F.2d 985, 991 (5th Cir.1992).[4] "First, the court assesses whether the agreement 'pertains to a well.'" *In re Complaint of John E. Graham & Sons*, 210 F.3d 333, 341 (5th Cir.2000). Once a "court concludes an agreement pertains to a well, the court than asks whether the agreement involves operations related to the exploration, development, production, or transportation of oil, gas, or water". *Id.*

■ The "threshold requirement for applicability of the [LOIA] is that the contract under scrutiny pertain to a well." *Transcontinental Gas*, 953 F.2d at 991. "If the contract does not pertain to a well, the inquiry ends." *Id.* Whether a contract "pertains to a well" is a fact intensive inquiry analyzed on a case-by-case basis. *Roberts*, 104 F.3d at 784. To determine whether an agreements "pertains to a well," the Fifth Circuit has adopted a functional, ten factor approach first enunciated in *Transcontinental*.[5] Although *Trans-*

---

4. In order to understand the genesis of the two-part test, the following organization of La. R.S. 9:2780(C) is instructive:

I. *Pertains To:* The term "agreement," as it pertains to a well for oil, gas, or water, or drilling for minerals ..., as used in this Section, means any agreement or understanding, written or oral,

II. *Related To:* concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals ..., including but not limited to

  A. drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or

  B. otherwise rendering services in or in connection with any well drilled for the

purpose of producing or excavating, constructing, improving, or

  C. otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or

  D. an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

5. The ten factors identified in *Transcontinental* include:

  (1) whether the structures or facilities to which the contract applies or with which

*continental*'s functional approach is most relevant in a case where the contract provides for work to be performed on a pipeline or other sections of a transmission system, it is not rendered inapplicable in dissimilar contexts. *In re Complaint of John E. Graham & Sons,* 210 F.3d at 342; *see also Broussard v. Conoco, Inc.,* 959 F.2d 42, 45 (5th Cir.1992)(*Transcontinental* factors relevant to catering contract for fixed platform). In fact, the Louisiana Supreme Court referred to the approach adopted in *Transcontinental* in a case which did not involve a transmission system. *Fontenot,* 676 So.2d at 564. As emphasized by the Fifth Circuit in *Transcontinental,* the language adopted by the Louisiana Legislature in describing the types of agreements governed by the LOIA emphasizes "the direct nexus needed between the agreement and the particular well to which it pertains." 953 F.2d at 991.

Centin urges the Court to disregard the *Transcontinental* functional approach and to adopt the holdings of *Day v. J. Ray McDermott, Inc.,* 492 So.2d 83 (La.App. 1st Cir.1986), and *Livings v. Service Truck Lines of Texas, Inc.,* 467 So.2d 595 (La. App. 3d Cir.1985).[6] Because both of these cases involved circumstances factually sim-

ilar to the case at bar, Centin contends that their holdings are controlling. It argues that like this action, both cases involved land based accidents, the particular structure or equipment that was the focus of the relevant contracts were not involved in actual production, and the work sites were geographically removed from any wells. Despite the apparent factual relevance of *Day* and *Livings,* Centin's reliance on them is misplaced.

As both cases were decided prior to *Transcontinental* and the Louisiana Supreme Court's adoption of *Transcontinental's* two-prong analysis in *Fontenot, Day* and *Livings* focused exclusively on whether the contracts were related to the exploration, development, production, or transportation of oil, gas or water. *Day,* 492 So.2d at 88; *Livings,* 467 So.2d at 599. Neither court attempted to ascertain whether the agreements in dispute pertained to a well. Unquestionably the agreements in both cases satisfied the "related to" prong as the construction of an offshore platform and the testing of drilling pipe directly facilitate the exploration and production of minerals. Whether the agreements could also satisfy the "pertain

it is associated, e.g. production platforms, pipelines, junction platforms, etc., are part of an in-field gas gathering system;

(2) what is the geographical location of the facility or system relative to the well or wells;

(3) whether the structure in question is a pipeline or is closely involved with a pipeline;

(4) if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities;

(5) whether the pipeline is a main transmission or trunk line;

(6) what is the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like;

(7) what is the purpose or function of the facility or structure in question;

(8) what if any facilities or processes intervene between the wellhead and the struc-

ture or facility in question, e.g., "heater treaters," compressor facilities, separators, gauging installations, treatment plants, etc.;

(9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question;

(10) and any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.

*Transcontinental Gas Pipe Line Corp.,* 953 F.2d at 994.

6. In *Day,* the plaintiff was injured while inspecting welds on an offshore platform under construction at a land based construction yard. 492 So.2d at 84. Similarly, the plaintiff in *Livings* was injured while testing inventory drilling pipe at a storage yard. 467 So.2d at 596.

to" prong is speculative at best and not at all certain.

Without any further guidance from the jurisprudence in this area, the Court must apply the functional approach of *Transcontinental* to determine if a direct nexus exists between the ENSCO–Centin Agreement and a well.[7] Like the catering contract evaluated in *Broussard*, the Court must apply an abridged version of the *Transcontinental* analysis. Specifically, the Court must consider the following factors:

(1) whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field production system;

(2) what is the geographical location of the structure or facility relative to a well or wells;

(3) what is the purpose or function of the facility or structure in question;

(4) who owns and operates the relevant facility or structure, and who owns and operates the well or wells that produce the gas in question;

(5) and any number of other details affecting the functional and geographic nexus between a well and the structure or facility that is the object of the agreement.

*Broussard v. Conoco, Inc.*, 959 F.2d at 45.

■ Applying these factors to the instant action, the Court finds that the ENSCO–Centin Agreement pertains to a well. The Agreement dealt with Centin's demolition, replacement and refurbishment of the living quarters and galley on ENSCO 23 so that ENSCO could satisfy its obligations to Amerada under the ENSCO–Amerada Contract. As recognized by the Fifth Circuit in *Broussard*, employee living quarters are related to in-field production. *Id.* The purpose or function of the facilities covered by the contract was to sustain

manpower for production and fulfil ENSCO's contractual obligations to Amerada. Although ENSCO 23 was geographically removed from any well sites, the *Broussard* decision "teaches that where the contract calls for work necessary to sustain the crew who work on individual wells, the required nexus to a well is established." *Roberts*, 104 F.3d at 785. While ENSCO owned ENSCO 23 and Amerada owned the wells that were to be drilled at Garden Banks Block 260, Amerada paid ENSCO a monthly fee to keep ENSCO 23 off of the market and to guarantee Amerada's exclusive use. This agreement effectively made Amerada the putative owner of ENSCO 23, creating a type of common ownership between the wells and the production equipment. Additionally, the existence of the ENSCO–Amerada Contract strengthens the functional nexus between the ENSCO–Centin Agreement and a well. If the ENSCO–Centin Agreement had been entered into without definite and specific future development plans for ENSCO 23, the nexus between the refurbishment work and a well would have been more attenuated. However, at the time of the execution of the ENSCO–Centin Agreement, ENSCO contemplated that ENSCO 23 was going to operate in the Gulf of Mexico at a well or wells located in Garden Banks Block 260. The *Transcontinental* factors relevant to this case favor the application of the LOIA.

■ The Court also finds that the ENSCO–Centin Agreement satisfies the "related to" prong of the *Transcontinental* analysis. Because the living quarters and galley are essential to the operation of a manned platform such as ENSCO 23, a contract to renovate those sections is related to the production of oil and gas within the scope of the LOIA. *Copous v. ODECO Oil & Gas Co.*, 835 F.2d 115 (5th Cir.1988).

---

**7.** The precise question before the Court, whether a contract to refurbish/repair a fixed platform in a construction yard, a location geographically remote from the drilling site, is within the scope of the LOIA, is one the Fifth Circuit has yet to address. *See Copous v. ODECO Oil & Gas Co.*, 835 F.2d 115 (5th Cir.1988).

## Conclusion

Based on the foregoing, the Court finds that the ENSCO–Centin Agreement is governed by Louisiana law and the provisions of the LOIA. Furthermore, the Court finds that the indemnity provision contained within the ENSCO–Centin Agreement is void and unenforceable pursuant to the LOIA as it pertains to a well and is related to the production or exploration of minerals. Since Centin is not obligated to render indemnity or defense to ENSCO for injuries suffered by Verdin in this action, the Court will grant Centin's motion for summary judgment and dismiss ENSCO's third-party complaint.

## JUDGMENT

In accordance with the Memorandum Ruling issued on this date,

IT IS ORDERED that the motion for summary judgment [doc. no. 33] filed by defendant and third-party plaintiff, EN-SCO Offshore Company, is DENIED.

IT IS FURTHER ORDERED that the motion for summary judgment [doc. no. 29] filed by third-party defendant, Centin, LLC, is GRANTED and ENSCO's third-party complaint is DISMISSED WITH PREJUDICE.