**Revised April 25, 2000**

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 99-30301
_____

In Re: In the Matter of the Complaint
of John E. Graham & Sons As Owner of M/V Sean G for
Exoneration From or Limitation of Liability

JOHN E. GRAHAM & SONS,

Plaintiff,

VERSUS

HORACE BREWER, ET AL.,

Defendants,

ENRON OIL & GAS COMPANY,

Defendant-Third
Party Plaintiff
Appellee

VERSUS

DYNAMIC OFFSHORE CONTRACTORS, INC.,

Third Party Defendant
Appellant.

_____

Appeal from the United States District Court
For the Western District of Louisiana, Lafayette Division
_____

April 18, 2000

**1**

Before HIGGINBOTHAM and PARKER, Circuit Judges, and WARD,[*] District Judge:

T. JOHN WARD, District Judge:

An offshore contractor appeals a decision casting it in judgment to an owner on an indemnity claim. Although it is a close question, we believe that the Texas Oilfield Anti-Indemnity Act bars enforcement of the indemnity agreement. Accordingly, we REVERSE.

## I.

## BACKGROUND AND PROCEDURAL POSTURE

In 1994, Enron Oil & Gas Company ("Enron") owned several offshore platforms in the Matagorda Island Area off the coast of the State of Texas. A bridge connected two of the platforms, and together they formed Enron's A-B complex. The A platform supported eight gas wells, and the B platform held the production facilities. The production side of the complex included gas separators, testing equipment, meters, quarters, and other devices used in the production of natural gas.[1] In general terms, the gas flowed from the wellheads located on the A platform through pipes to a manifold and then through a series of pipes to separators and testing

---

[*] District Judge of the Eastern District of Texas, sitting by designation.

[1] Raw natural gas contains both gas and liquid hydrocarbons. Separators remove the liquid hydrocarbons from the gas. Howard R. Williams et al., *Manual of Oil and Gas Terms* 983 (10th ed. 1997)(defining "separation").

equipment on the B side of the complex. After the initial separation of the liquid hydrocarbons from the gas, the gas flowed through a sales meter and into a pipeline.

In addition to the two structures forming the A-B complex, Enron also operated a nearby satellite platform. The satellite platform supported three gas wells which Enron had completed in 1993 and 1994. However, the satellite platform lacked its own separators and testing facilities, so Enron needed to move the flow of gas from the wellheads on the satellite platform to the equipment on the A-B complex. Enron could not produce the new wells until it connected the satellite platform to the A-B complex.

Enron contracted with Offshore Pipeline, Inc. ("OPI") to lay a pair of pipelines between the satellite platform and the A-B complex. Enron' agreement with OPI also required OPI to install risers at the ends of the pipelines to facilitate the connection of the new wells on the satellite platform to the new pipelines, and, in turn, the new pipelines to the existing manifold located on the A-B complex.[2]

After the installation of the pipelines, Enron needed to connect the wells on the satellite platform to the risers installed by OPI. Enron also needed to attach the risers running up the leg of the A platform to the existing manifold. Moreover, the

---

[2] A riser is a vertical extension of the horizontal pipeline at the bottom of the platform which allows the pipeline to run vertically up the platform.

inclusion of the production from the three new wells required modifications to the safety system located on the A-B complex. Enron hired Dynamic Offshore Contractors ("Dynamic") to perform these portions of the job. Enron and Dynamic had previously entered into a master service contract which contained a provision requiring Dynamic to indemnify Enron for damages caused by Enron's negligence.[3] Pursuant to the master service contract, Enron solicited and accepted Dynamic's bid to complete the tie-in of the satellite platform. The work order between Enron and Dynamic called for Dynamic to perform several tasks on both the satellite platform and the A-B complex. On the satellite platform, Dynamic fabricated and installed a manifold, connected flowlines from the three individual Christmas trees to the new manifold, and installed

---

[3] The master service contract, entered in 1991, provided in part that:

> [Dynamic] agrees to protect, defend, indemnify and hold [Enron] harmless from and against all damage, loss, liability, claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes thereof, including but not limited to strict liability or the unseaworthiness or unairworthiness of any vessel or craft, or the negligence of any party, including but not limited to the sole or concurrent negligence of [Enron], arising in connection herewith in favor of [Dynamic's] agents, invitees and employees, and [Dynamic's] subcontractors and their agents, invitees and employees, on account of damage to their property or on account of bodily injury or death. . . .

a pneumatic safety system.[4]  On the A-B complex, Dynamic installed piping from the risers installed by OPI to the existing manifold, modified the safety shutdown system on the A platform to incorporate the two new incoming pipelines, and installed shut down valves and check valves.  These modifications allowed the operator to segregate the product from each individual well for testing and enabled the operator to shut in any particular well in case of an emergency.

During the project, Daniel Koonce ("Koonce") and Horace Brewer ("Brewer"), two Dynamic employees, were injured while being lowered in a personnel basket from the satellite platform onto the deck of a boat owned by John E. Graham & Sons ("Graham").  OCS, Inc. ("OCS") employed the crane operator.  At the time of the accident, Brewer and Koonce were installing connecting spools in a riser attached to the satellite platform.  This case arose in admiralty when Graham filed a petition seeking exoneration from or a limitation of liability in response to the personal injury claims made by Brewer and Koonce.  When Brewer and Koonce filed cross-claims against Enron, Enron demanded that Dynamic honor the indemnity covenant contained in the master service contract. Dynamic refused, prompting Enron to file a third party action

---

[4]  The Christmas tree is the uppermost assembly of valves  on a gas well.  Williams, *supra*, at 157.  This assembly is shaped somewhat like and referred to in the industry as a Christmas tree.

against Dynamic for breaching the indemnity provision.

The parties settled the personal injury claims for $550,000. Thereafter, the district court held a bench trial to apportion fault among OCS, Enron and Graham.[5] The court found that OCS bore the majority of responsibility, at 75%. The court found Enron 20% at fault, and Graham, 5%. The only remaining question was whether the indemnity provision between Dynamic and Enron was enforceable under the Texas Oilfield Anti-Indemnity Act ("TOAIA"). The court originally invalidated the provision but, on rehearing, revisited the issue and enforced it. Having concluded that Dynamic owed Enron an indemnity obligation, the district court awarded Enron $110,000 against Dynamic (representing 20% of the total settlement), plus an additional $56,200 in attorney's fees and costs. Dynamic appeals, asserting that the indemnity provision of the master service contract is unenforceable under the Texas Oilfield Anti-Indemnity Act ("TOAIA").

II.

A. APPLICABLE LAW AND STANDARD OF REVIEW

---

[5] Enron stipulated that it owed an indemnity obligation to OCS and Graham. And, at trial, Enron took the position that it, rather than OCS or Graham, bore the bulk of responsibility for the accident. Apparently, the purpose behind this strategy was to try to reduce the responsibility of OCS and Graham, concomitantly lowering the amount Enron would owe because of its indemnity arrangement with those parties. At the same time, if the court found that Enron had been primarily at fault, Enron could attempt to pass its liability through to Dynamic under the terms of the master service contract.

**6**

The parties have agreed that Texas law governs this dispute. Because the facts in this case are undisputed, we turn to the question whether the indemnity provision is enforceable under Texas law. We review the district court's determination of Texas law *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 231, 111 S.Ct. 1217, 1220-21, 113 L.Ed.2d 190 (1991). We apply the law of Texas as announced by that state's highest court, or, in absence of such a decision, we must predict what the highest court would decide if it confronted the same issue. *Transcontinental Gas v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992). In this case, there is an absence of authority from the Texas Supreme Court on the dispositive issue. Therefore, we must anticipate what that court would do under these facts.

Under Texas law governing statutory construction, the primary objective of a court is to give effect to the Legislature's intent. *Mitchell Energy Corp. v. Ashworth*, 943 S.W.2d 436, 438 (Tex. 1997). In ascertaining legislative intent, Texas courts would consider the object to attain, the circumstances of the statute's enactment, legislative history, former statutory and common law, and the consequences of a particular construction. Tex. Gov't Code § 311.023; *Mitchell Energy*, 943 S.W.2d at 438. The Texas Supreme Court would attempt to give the statute the meaning the Legislature intended, keeping in mind the old law, the evil, and the remedy. *Id.*

**7**

In this case, Dynamic asserts that its agreement with Enron contemplated well or mine service, implicating the protections of the TOAIA. Therefore, according to Dynamic, the district court erred when it enforced the indemnity agreement contained in the master service contract. Enron asserts that Dynamic's work fell within an exclusion, rendering enforceable Dynamic's indemnity obligation. Our study of the TOAIA informs us that Dynamic's agreement with Enron sufficiently contemplated well or mine service to render the indemnity agreement unenforceable.

### B. THE TEXAS OILFIELD ANTI-INDEMNITY ACT

#### 1. HISTORY AND PURPOSE

The TOAIA invalidates certain indemnity provisions contained in agreements pertaining to wells for oil, gas, or water, or to mines for minerals.[6] In 1973, on the heels of New Mexico's

---

[6] The current version of the TOAIA provides in part:

(a) Except as otherwise provided by this chapter, a covenant, promise, agreement, or understanding contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water or to a mine for a mineral is void if it purports to indemnify a person against loss or liability for damage that:

　(i)　is caused by or results from the sole or concurrent negligence of the indemnitee, his agent or employee, or an individual contractor directly responsible to the indemnitee; and

　(ii) arises from:

　　(A)　personal injury or death;

　　(B)　property injury; or

**8**

adoption of a similar statute, the Texas Legislature created an interim committee to study the effects of hold harmless agreements extracted from service contractors in the petroleum industry. *House Interim Study Committee on Hold Harmless Agreements, Report*, 63rd Leg. i (1973). The Legislature noted that the expense of contracting for the negligence of a third party often put the small contractor in a precarious financial position. *Id.* The committee considered the arguments for and against the adoption of the TOAIA and, noting inequities between large oil companies and small contractors, ultimately recommended that the Legislature adopt the TOAIA. *Id.* at 3-8. After receiving the committee's recommendation, the Legislature enacted the TOAIA to curb the perceived inequity. In general, the TOAIA provides that certain agreements which provide for indemnification of a negligent indemnitee are void as against public policy. Tex. Rev. Civ. Stat. art. 2212b (now codified at Tex. Civ. Prac. & Rem. Code § 127.001-007).

2. THE SCOPE OF THE TOAIA AND ITS DEFINITION OF

"WELL OR MINE SERVICE"

The TOAIA invalidates indemnity provisions contained in

---

     (C) any other loss, damage, or expense that arises from personal injury, death, or property injury.

Tex. Civ. Prac. & Rem. Code § 127.003.

agreements pertaining to wells for oil, gas or water or to mines for minerals. Under the TOAIA, an agreement pertains to a well if it requires the contractor to render "well or mine services" or "to perform a part of those services or an act collateral to those services . . . ." Tex. Civ. Prac. & Rem. Code § 127.001(1)(A)(i)-(ii). In turn, the TOAIA defines "well or mine service" to encompass a broad range of activities, including:

> (i) drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, purchasing, gathering, storing, or transporting oil, brine water, fresh water, produced water, condensate, petroleum products, or other liquid commodities, or otherwise rendering services in connection with a well drilled to produce or dispose of oil, gas, other minerals or water; and

> (ii) designing, excavating, constructing, improving, or otherwise rendering services in connection with a mine shaft, drift, or other structure intended for use in exploring for or producing a mineral . . . .

Tex. Civ. Prac. & Rem. Code § 127.001(4)(A)(i)-(ii) (Vernon 1997). If an agreement calls for well or mine services, for a part of those services, or for an act collateral to those services, it is within the scope of the TOAIA.

The Texas Supreme Court has counseled that the TOAIA is to be strictly construed to permit parties to contract freely with regard to agreements not covered by the statutory language. *Getty Oil Co. v. Insurance Co. of N. America*, 845 S.W.2d 794, 805 (Tex. 1992), *cert. denied sub nom., Youll & Companies v. Getty Oil Co.*, 114 S.Ct. 16 (1993). In *Getty Oil*, the Court addressed whether an

**10**

"additional insured" provision in a purchase order was invalidated by the TOAIA. *Getty Oil*, 845 S.W.2d at 805. The court strictly construed the terms of the TOAIA and rejected the argument that sanctioning the insurance shifting provision would have the practical effect of relieving the oil company of responsibility for its sole negligence. *Id.* The Court held that the TOAIA applied exclusively to indemnity agreements and did not prohibit insurance shifting arrangements not expressly covered by the statute. *Id.* Although the present case does not involve the same type of contractual provision addressed by *Getty Oil*, we believe that the Texas Supreme Court would strictly construe the TOAIA in assessing whether an agreement comes within its scope.

Although the Texas Supreme Court has not considered the definition of well or mine service, intermediate Texas courts have required a close nexus between production activities and the agreement at issue. For instance, in *Transworld Drilling Co. v. Levingston Shipbuilding Co.*, 693 S.W.2d 19, 23 (Tex. App.–Beaumont 1985), the court held that the TOAIA did not apply to an agreement to repair an offshore drilling rig when the contractor performed the repairs in a shipyard. The contractor asserted that it was rendering services in connection with a structure intended for use in the exploration for or production of a mineral. *Transworld*, 693 S.W.2d at 23. The court rejected this argument and reasoned that the Legislature did not intend to cover an on-shore repair contract

**11**

when the record revealed no connection with the drilling of an actual well. *Id*.

Likewise, in *Singleton v. Crown Cent. Petroleum Corp.*, 713 S.W.2d 115, 121 (Tex. App.–Houston [1st Dist.] 1985), *rev'd on other grounds*, 729 S.W.2d 690 (Tex. 1987), the court summarily held that a contract between a petroleum company and its contractor requiring work to be performed inside the company's plant was not covered by the TOAIA. Consistent with *Transworld*, the court characterized the TOAIA as a statute prohibiting certain agreements pertaining to a well site for oil, gas, or water, or to a mine for a mineral. *Singleton*, 713 S.W.2d at 121. Because the agreement involved in *Singleton* was a construction contract for work to be performed at a plant, the TOAIA did not apply.

Finally, in *Coastal Transport Co. v. Crown Central Petroleum Corp.*, 2000 WL 33062 (Tex. App.–Houston [14th Dist.] 2000, n.w.h.), the court held that the TOAIA did not invalidate an indemnity provision contained in a terminal loading agreement between a trucking company and a petroleum refiner. The case arose when an employee of Coastal, the trucking company, was injured in a gasoline fire at Crown Central's loading terminal. Coastal argued that the agreement concerned "well or mine services" because transporting gasoline was an act collateral to well services. The court rejected this argument, reasoning that the TOAIA only applies to contracts for "services involved in the drilling or servicing of

**12**

wells." *Coastal Transport*, 2000 WL 330062 at *7. Because Crown was in the business of refining, supplying, and transporting petroleum products, the TOAIA did not apply. *Transworld*, *Singleton*, and *Coastal Transport* all stand for the proposition that, for an agreement to fall within the TOAIA, it must bear a close nexus to a well drilled for oil, gas, or water, or to a mine for a mineral.

### 3. THE PIPELINE EXCLUSION

The Legislature has also limited the definition of well or mine service. In 1991, the Legislature amended the TOAIA to exempt from the definition of well or mine service certain activities related to pipelines. Under the TOAIA, "well or mine service" does not include:

> (i) purchasing, selling, gathering, storing, or transporting gas or natural gas liquids by pipeline or fixed associated facilities; or

> (ii) construction, maintenance, or repair of oil, natural gas liquids, or gas pipelines or fixed associated facilities.

Tex. Civ. Prac. & Rem. Code § 127.001(4)(B)(i)-(ii).[7]

Our research has revealed only one decision that has considered the pipeline exclusion. In *Phillips Petroleum Co. v.*

---

[7] The 1991 amendment also deleted the word "gas" from subsection (4)(A)(i) immediately following the terms "gathering, storing, or transporting oil." The amendment did not remove the word "gas" from the later provision of the same definition which provides that well or mine service includes "otherwise rendering services in connection with a well drilled to produce or dispose of oil, gas, other minerals or water."

*Brad & Sons Const. Inc*., 841 F.Supp. 791 (S.D. Tex. 1993), the court held that the TOAIA did not apply to a contract to repair a leak in a pipeline located in a gathering field 800 feet from the nearest well. *Id.* at 796. The court noted that the Legislature intended the 1991 amendments to the TOAIA to clarify the already existing definition of well or mine service. *Id.* In reaching this conclusion, the court relied heavily on the fact that the Legislature had expressly given the 1991 amendments retroactive effect. *Id.* The court held that the contract did not call for work within the definition of well or mine service existing before or after the amendments. In other words, the agreement in *Phillips* called for work lacking the necessary proximity to a well. *Phillips*, like the decisions announced by the intermediate Texas courts, reinforces the requirement that a close nexus must exist between the agreement and an actual well drilled to produce oil, gas, or water.

## C. THE LOUISIANA OILFIELD ANTI-INDEMNITY ACT–SIMILARITIES AND DIFFERENCES

Although this court has only scarcely considered the scope of the  TOAIA, it has addressed on several occasions the breadth of the Louisiana Oilfield Anti-Indemnity Act ("LOAIA").[8]  While we

---

[8]  This court has never considered the definition of well or mine service under the TOAIA. This court's decisions under the TOAIA address other provisions of the act, such as the provision permitting certain cross-indemnity arrangements when they are supported by insurance. *See, e.g., Greene's Pressure Testing & Rentals v. Flournoy Drilling Co.*, 113 F.3d 47, 51 (5th

find some guidance in this court's decisions under the LOAIA, we note differences in the structure of that act and the TOAIA. Accordingly, while we refer to this court's LOAIA decisions for guidance, we do so only to the extent that the particular holdings are supported by similar language set forth in the TOAIA.

We first note the similarities in the two laws. Under the LOAIA, this court has stressed that when the LOAIA speaks of invalidating "agreements," the relevant agreement is the particular work order giving rise to the claim. *See Roberts v. Energy Development Corp.*, 104 F.3d 782, 784 n.3 (5th Cir. 1997)(applying Louisiana's version of the Act and focusing on oral work order); *Johnson v. Amoco Production Co.*, 5 F.3d 949, 952 (5th Cir. 1993)(same). It is common practice for companies and contractors to enter into master service agreements, the specific terms of which govern future work performed by the contractor pursuant to individual work orders or authorizations. Like its Louisiana counterpart, the TOAIA invalidates "agreements," and we are persuaded that the relevant agreement we must consider is the work order between Dynamic and Enron giving rise to this claim.

Furthermore, because offshore production differs from land-based production, we have held that multiple wells directionally drilled and situated on a single platform constitute one "well" for purposes of the LOAIA. *Transcontinental,* 953 F.2d at 995 n. 40.

_____

Cir. 1997).

**15**

Like many offshore platforms, the ones involved in this case supported multiple wells. On this point, we find the reasoning of *Transcontinental* persuasive and hold that multiple wells supported by a single platform constitute a single "well" for purposes of the TOAIA.

But this court's decisions under the LOAIA provide less support for deciding the question whether a particular agreement contemplates "well or mine service" under the TOAIA. Under the LOAIA, this court applies a two step approach to determine whether an agreement falls within the scope of that legislation. *Transcontinental,* 953 F.2d at 991. First, the court assesses whether the agreement "pertains to a well." *Id.* To determine whether an agreement "pertains to a well," this court has adopted a functional approach. *Id.* at 994-95 (setting forth "*Transcontinental* factors").[9] If, after applying the

_____

[9] The *Transcontinental* factors include:

(1) whether the structures or facilities to which the contract applies or with which it is associated are part of an in-field gas gathering system;
(2) what is the geographic location of the facility or system relative to the well or wells;
(3) whether the structure in question is a pipeline or is closely involved with a pipeline;
(4) if so, whether that line picks up gas from a single well or a single production platform or instead carries commingled gas originating from different wells or production facilities;
(5) whether the pipeline is a main transmission line or trunk line;
(6) what is the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like;

*Transcontinental* factors, the court concludes that an agreement pertains to a well, the court then asks whether the agreement involves operations related to the exploration, development, production, or transportation of oil, gas, or water. *Id.* at 991. If it does, the LOAIA applies; otherwise, it does not. *Id.*

Dynamic relies on this court's LOAIA cases to assert that its agreement with Enron "pertained to a well." *See, e.g., Lloyds of London v. Transcontinental Gas Pipe Line Corp.*, 38 F.3d 193, 197 (5th Cir. 1994)(holding that work performed at or upstream from metering point pertained to a well under the LOAIA); *Copous v. ODECO Oil & Gas Co.*, 835 F.2d 115, 116 (5th Cir. 1988)(contract for the renovation of living quarters on a manned offshore platform within the scope of the LOAIA). While we agree generally with Dynamic's reading of this court's LOAIA cases, we disagree with Dynamic's conclusion that those cases are controlling because it rests on the faulty assumption that the LOAIA and the TOAIA are similarly structured. The language of the LOAIA differs from the

(7) what is the purpose or function of the facility or structure in question;
(8) what if any facilities or processes intervene between the wellhead and the structure or facility in question, e.g., "heater treaters," compressor facilities, separators, gauging installations, treatment plants, etc.;
(9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question;
(10) and any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.

TOAIA, and that difference renders suspect Dynamic's analogy to our decisions under the LOAIA.

Primarily, the TOAIA contains a provision exempting certain pipeline-related activities. This court recently cautioned that the *Transcontinental* approach is most relevant in a case where the contract provides for work to be performed on a pipeline or other part of the transmission system and where that work has little, if any, connection to a well. *Roberts v. Energy Development Corp.*, 104 F.3d 782, 785 (5th Cir. 1997). The TOAIA's pipeline exclusion, absent from the LOAIA, generates friction with this court's *Transcontinental* approach. *Roberts* and the TOAIA's pipeline exclusion counsel against Dynamic's attempt to apply, *carte blanche*, this court's LOAIA decisions to cases arising under the TOAIA.

We further reject wholesale application of decisions under the LOAIA to the cases arising under the TOAIA because the definitional section of the LOAIA differs from the one provided by the TOAIA. The relevant language of the LOAIA provides that "'agreement' *as it pertains* to a well for oil, gas, or water . . . . means any agreement or understanding . . . concerning any operations related to the exploration, development, or production, or transportation of oil, gas, or water . . . ." La. Rev. Stat. Ann. § 9.2780 (emphasis added); *see Transcontinental*, 953 F.2d at 991. Under the LOAIA, the phrase "as it pertains to a well" is not defined as part

**18**

of the preceding term "agreement." The undefined phrase "as it pertains to a well" is, in part, language that led this court to adopt a functional analysis to answer the question whether a given agreement "pertains to a well." *Transcontinental*, 953 F.2d at 991 (noting that "[w]e can come to no conclusion but that the legislature intended the Act to apply if (but only if) an agreement pertains to a well"). By contrast, the TOAIA defines the entire phrase "[a]greement pertaining to a well for oil, gas, or water or to a mine for a mineral." Tex. Civ. Prac. & Rem. Code § 127.001(1). Given that the TOAIA defines this entire phrase, while the LOAIA leaves "as it pertains to a well," undefined, this court's decisions applying the *Transcontinental* factors are not on point.

Accordingly, we derive our holding from the language and purpose of the TOAIA, as opposed to borrowing from decisions applying *Transcontinental*. We begin by noting that the Legislature listed no less than fifteen specific activities within the definition of well or mine services. The definition includes well services ranging from pre-completion tasks such as "drilling" to post-completion work such as "deepening" and "reworking." The definition also includes general maintenance tasks such as "repairing" and "improving" together with services performed with an eye toward regulatory requirements, i.e. "testing." Finally, the definition includes "treating," a service necessary to prepare

**19**

the ultimate product for transportation and sale.  Tex. Civ. Prac. & Rem. Code § 127.001(4)(A)(i).

In addition to the several activities specifically set forth within the definition of well or mine service, the Legislature included a catch-all provision.  Specifically, the definition of well or mine services includes "otherwise rendering services *in connection with* a well drilled to produce oil, gas, other minerals, or water."  Tex. Civ. Prac. & Rem. Code § 127.001(A)(4)(i)(emphasis added).  We believe that the Legislature's use of the terms "otherwise rendering services in connection with a well" indicates an intent to expand the scope of activity constituting well or mine service to other types of work falling within the same general class or category as the activities specifically listed in the definition.  *See, e.g., Dawkins v. Meyer,* 835 S.W.2d 444, 447 (Tex. 1992)(discussing statutory construction and rule of *ejusdem generis*).  The specifically listed activities are all typically performed in close proximity to a well, but not all of them are directed at the wellbore itself.  Moreover, as relates to gas wells, the specifically listed activities are directed toward the goal of obtaining or maintaining production from a well.  We hold that a contractor is "otherwise rendering services in connection with a well" if the services called for by the contract bear a close nexus to a well and are directed toward the goal of obtaining or maintaining production from a well.

## III.   ANALYSIS AND HOLDING

### A.   DYNAMIC'S AGREEMENT WITH ENRON CONTEMPLATED WELL OR MINE SERVICES

We hold that Dynamic's agreement with Enron contemplated well or mine services.  As we have noted, Texas law requires a close nexus between the production activities and the agreement.  We find that requirement satisfied in this case.  Particularly, the agreement called for Dynamic to fabricate and install a manifold on the satellite platform and tie in flowlines to the actual wellheads located on that platform.  Likewise, on the A-B complex, Dynamic's modification of the safety shutdown system to facilitate the preservation of the production facilities and the employees manning them in case of an emergency satisfies the requisite connection to a well.  Moreover, Dynamic's services were performed to further the goal of obtaining or maintaining production from Enron's satellite wells.  Our treatment of the multiple wells on the platforms as one "well" under the TOAIA reinforces our decision, because we view these platforms as integral to the drilling and production operations. Dynamic's services, involving work on the platforms themselves, are directly supportive of the wells.

### B.   THE PIPELINE EXCLUSION DOES NOT EXEMPT THE AGREEMENT FROM THE DEFINITION OF WELL OR MINE SERVICE

Enron relies heavily on the TOAIA's pipeline exclusion to urge

that its agreement with Dynamic did not contemplate well or mine service. Although we credit the Legislature's intent to restrict the activity comprising well or mine service, we reject Enron's argument because Dynamic's contract with Enron called for services above and beyond simply installing piping associated with a well. For this reason, Enron's argument, though not without some force, does not convince us that the exclusion validates the present indemnity arrangement.

Although the TOAIA contains a pipeline exclusion, it does not define "pipeline." For the reasons discussed below, we need not determine where the well "ends" and the "pipeline" begins to decide this case. However, Enron suggested at oral argument that, for purposes of this and future cases involving the pipeline exclusion, we should hold that the well "ends" and the pipeline "begins" at the choke.[10] In other words, Enron would have us hold that any agreement calling for work to be performed downstream from the well choke falls within the pipeline exclusion. We reject Enron's argument because it is inconsistent with at least three terms contained in the definition of well or mine service.

First, the definition of well or mine service includes "testing." The undisputed facts of this case indicate that the testing facilities for the three wells located on the satellite

---

[10] The well choke is a valve located near the top of the wellhead which controls the volume of gas flowing out of the well.

platform were actually located on the B side of the A-B complex. The testing facility on the A-B complex was the location that the flow from the individual wells could be segregated and directed through a test separator for testing required by the Minerals Management Service ("MMS"). The Legislature's use of the term "testing" indicates its intent to include at least some types of service work performed downstream from the wellbore. Enron's identification as the well choke as the point at which well service stops and pipeline service starts would render meaningless the Legislature's inclusion of "testing" as a type of well or mine service.

Second, well or mine service includes "treating." Again, the initial treatment of the natural gas produced from the satellite platform occurred at the separation facilities located on the A-B complex. Until the raw gas passed through the separators, it still contained both natural gas and liquid hydrocarbons. Although we note that natural gas may go through various stages of treatment throughout its transmission to the ultimate consumer, we must strive to give effect to the Legislature's use of the term "treating," as it relates to well service. The use of the term "treating," at a minimum, indicates that the Legislature intended to include at least initial treatment of product prior to its transmission and sale. Enron's selection of the well choke, a point upstream from the initial treatment point, fails to give

effect to the Legislature's intent.

Finally, the definition of well or mine services includes "otherwise rendering services *in connection with* a well . . . ." (emphasis added). The Legislature did not limit well services to those performed *in* a well, but rather included work performed *in connection with* a well. The broader language "in connection with" indicates a legislative intent to include services other than those performed in the wellbore itself. Enron's suggested limitation of well services to those performed in the wellbore fails to give meaning to this phrase.

Enron also asserts that Dynamic's construction and fabrication work is not well "service." Enron seems to assert that fabrication work or construction work performed at or in close proximity to a well site can never constitute well "service." We disagree. Construction work is a type of service often provided by oil and gas service contractors. In fact, the parties' agreement is titled a master *service* contract. It characterizes Dynamic as a "service contractor," albeit one engaged in the construction and fabrication business. While *pipeline* construction is exempted from the definition of well or mine service, Dynamic's contract with Enron contemplated work above and beyond simply installing pipes. Even if we were to assume, *arguendo*, that connecting flowlines to the risers on the legs of the platform constituted pipeline construction within the meaning of the exemption, Dynamic also

**24**

fabricated a manifold to be affixed to the satellite platform, modified safety systems and tied flowlines into the Christmas trees on the satellite platform. Although the pipeline exclusion exempts pipeline construction from the definition of well or mine service, we believe that the Legislature intended only to exempt those agreements which, in their entirety, contemplate work within the exclusion. In this case, the agreement between Dynamic and Enron was not limited solely to construction, repair or maintenance of a pipeline, even if we assume that the piping installed by Dynamic constituted a "pipeline" under the TOAIA. Therefore, the TOAIA applies to the indemnity covenant in the master service contract.

IV. CONCLUSION

In conclusion, we hold that Dynamic's contract with Enron contemplated "well or mine service" under the TOAIA. We also hold that the agreement was not limited to work falling under the pipeline exclusion. As a result, the TOAIA applies to invalidate Dynamic's indemnity obligation. We REVERSE the judgment of the district court and RENDER judgment that Enron take nothing by way of its third party action.