745 So.2d 676 (1999)
AMOCO PRODUCTION COMPANY COG-EPCO 1992 LIMITED PARTNERSHIP, and Torch Energy Advisors, Inc.
v.
LEXINGTON INSURANCE COMPANY.
No. 98 CA 1676.
Court of Appeal of Louisiana, First Circuit.
September 24, 1999.
Rehearing Denied November 17, 1999.
*677 Brett Furr, Baton Rouge, Counsel for Plaintiffs/Appellants, Amoco Production Company, COG-EPCO 1992 Limited Partnership, and Torch Energy Advisors, Inc.
Patrick McShane, New Orleans, Counsel for Defendant/Appellee, Lexington Insurance Company.
Before: CARTER, C.J., LeBLANC and PETTIGREW, JJ.
LeBLANC, J.
This is an appeal of a summary judgment granted in favor of the defendant, Lexington Insurance Company (Lexington), allowing Lexington to invoke the provisions of the Louisiana Oilfield Anti-Indemnity Act (LOAIA) to invalidate plaintiffs', Amoco Production Company, COG-EPCO 1992 Limited Partnership, and Torch Energy Advisors, Inc. (Amoco), claims for insurance under two Lexington policies, primary and excess general liability, procured by Pride Petroleum Services (Pride). The issue on appeal is whether the trial court erred in determining the LOAIA was applicable to the policies in question, thereby invalidating the coverage provided thereby.

Background Facts and Procedural History
Pursuant to a Well and Lease Master Service Contract executed on July 28, 1988 between Amoco and Pride, Pride performed workover operations at Amoco's Dorothy Brown No. 8 well in Pointe Coupee Parish. On July 15, 1995, an explosion occurred during these operations fatally injuring one Pride employee and seriously injuring other Pride employees. Numerous suits were filed against Amoco as a result of the incident. Amoco filed claims for insurance coverage against Lexington Insurance Company as an additional assured under the primary comprehensive general liability and excess policies which had been procured by Pride.
It is undisputed that at the time of the loss (July 15, 1995), Pride was the only named insured covered under the policies and Amoco had not yet been named as an additional assured. By a single-page endorsement dated September 6, 1995 (two months after the explosion), entitled "Addendum No. 11 to Cover Note dated 19th January 1995," Amoco was named as an additional assured on Pride's primary liability policy.
Lexington rejected Amoco's claims for coverage under the Pride liability policies, invoking the provisions of the LOAIA to void the endorsement adding Amoco as an additional assured. Amoco filed this action for declaratory judgment and for damages, asserting its status as a named insured under the two Lexington policies, and further invoking the provisions in the policies that provide for contractual indemnity coverage for Pride's obligations to indemnify and defend Amoco. The trial court granted Lexington's Motion for Summary Judgment, finding the LOAIA applicable and voiding the coverage claimed by Amoco.
On appeal, Amoco makes the following assignments of error: (1) the trial court erred as a matter of law in granting summary judgment because of the numerous material factual issues which are in dispute; (2) the trial court erred as a matter of law in its interpretation of the LOAIA; and (3) summary judgment was premature because it was granted when discovery was only beginning, and Amoco had not had a chance to depose the necessary individuals (Pride and Lexington representatives who were involved in the purchase of the policies) to determine the material fact of whether the policies were collateral to the master service agreement.

The Well and Lease Service Master Contract
In its contract with Amoco, Pride agreed to defend and indemnify Amoco for any and all liability exposure for losses arising out of Pride's operations under the contract, even those occasioned as a result of Amoco's own fault or negligence. The *678 agreement specifically required Pride to insure its assumption of liability limited to the amounts of its current liability insurance (with minimum limits of $100,000 each person and $300,000 each occurrence for bodily injury); however, there is no requirement in the agreement that Amoco be named as an additional assured on any liability policies procured by Pride.

The Lexington Policies
Pride procured two insurance policies through Lexington, with itself as the named insured: a primary comprehensive general liability policy with $1,000,000 limits and an excess policy with $25,000,000 limits. Both policies specifically provide Pride with contractual indemnity coverage. Furthermore, each of these policies also expressly allowed for coverage for additional assureds, where such coverage was required by written contract, bid or work order. However, as noted above, the agreement between Amoco and Pride did not trigger this coverage, as it did not require that Amoco be named an additional assured. Exhibits in the record reveal that, for the year 1995, Pride paid approximately two and one half million dollars in premiums for both policies.

Special Endorsements Adding Amoco as a Named Insured Under Pride's Lexington Policies
By way of "Addendum No. 11", Amoco was added as a named insured under Pride's primary and excess policies with Lexington. It is an undisputed fact that the total premium for these endorsements was $2,000 and was paid by Amoco. The endorsements were a result of a meeting between Pride and Amoco representatives in October, 1995, approximately three months after the explosion from which the relevant claims arise. However, it is also undisputed that these endorsements were intended, by Pride and Amoco representatives, to have retroactive effect, to the beginning of the year 1995, thus providing coverage for the liabilities arising out of the Dorothy Brown well explosion.

The Louisiana Oilfield Anti-Indemnity Act
In Fontenot v. Chevron U.S.A. Inc., 95-1425 (La.7/2/96), 676 So.2d 557, the supreme court interpreted the LOAIA, La. R.S. 9:2780, in determining its application to a waiver of subrogation clause in a worker's compensation insurance policy. Noting that the act is an exception to general Louisiana law where a principal may be contractually indemnified against his own fault or negligence so long as that intent is clearly expressed, the court stated that the act "arose out of a concern about the unequal bargaining power of oil companies and contractors and was an attempt to avoid adhesionary contracts under which contractors would have no choice but to agree to indemnify the oil company, lest they risk losing the contract." Fontenot, 95-1425 at p. 8, 676 So.2d at 563.
The Act itself expressly reflects its purpose at La. R.S. 9:2780(A) as follows:
The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals... to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee.... (Emphasis added.)
Subsection B of La. R.S. 9:2780 incorporates the stated purpose of the Act, providing:
Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, ... is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the *679 indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, ....
With regard to insurance agreements, subsection D of La. R.S. 9:2780 provides:
(1) The provisions of this Section do not affect the validity of any insurance contract, except as otherwise provided in this Section.... (Emphasis added.)
Subsection G of La. R.S. 9:2780 specifically addresses waiver of subrogation and additional named insured endorsements and modifies the provisions of subsection (D) above, as follows:
Any provision in any agreement arising out of the operations, services, or activities listed in ... this Section ... which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.
Subsection (I) further broadens the scope of the Act to cover "certain provisions contained in, collateral to or affecting agreements" covered by the Act "which are designed to provide indemnity to the indemnitee for all work performed between the indemnitor and the indemnitee in the future."

Application of the LOAIA
Amoco concedes that the defense and indemnity provision in the Master Service Agreement between itself and Pride violates the express terms of the LOAIA and cannot be enforced against Pride. However, Amoco contends that the insurance policies, which were negotiated and issued "wholly without regard to the Master Contract" are not prohibited by the LOAIA. In support of its argument, Amoco cites subsection (D)(1) of the Act, which provides that the provisions therein do not affect the validity of any insurance contract. However, Amoco practically ignores the caveat to that provision: "except as otherwise provided in this section...." Indeed, subsection (G) provides otherwise for additional named insured endorsements, such as is at issue in this matter, declaring such to be "null and void and of no force and effect" when such insurance protection would frustrate or circumvent the prohibitions of the Act. Thus, the issue of the validity of the Lexington policies as to Amoco turns on whether such policies fall within the scope of the LOAIA, and if so, whether the coverage provided therein runs afoul of the stated purpose of the LOAIA.
Lexington argues that the insurance agreement with Amoco is collateral to the Master Service Agreement between Amoco and Pride, thus falling within the ambit of subsection (I) of the Act. Amoco, on the other hand, contends that the insurance coverage was negotiated "wholly without regard to the Master Contract" and that further discovery is needed to determine the material fact of whether the policies are collateral.
We reject Amoco's contention that the insurance coverage was negotiated without regard to the Master Contract. The wording in the endorsements adding Amoco as an additional assured specifically limits Amoco's coverage for any liability arising out of the work done by/with Pride only; the endorsements do not cover Amoco for any other unrelated liability. In other words, but for the Master Contract between Amoco and Pride, Amoco would have no coverage under the Lexington policies. We are further persuaded by the federal court's holding in Babineaux v. McBroom Rig Building Service, Inc., 806 F.2d 1282, 1284 (5th Cir.1987), that insurance agreements are collateral within the meaning of the LOAIA's prohibitions, as well as our own supreme court's reliance on that case in determining that a waiver of subrogation was also a collateral agreement and subject to the provisions of the LOAIA in Fontenot v. Chevron U.S.A. Inc., 95-1425 (La.7/2/96), 676 So.2d 557.
*680 Thus, the final inquiry is whether the application of the LOAIA to the insurance contract between Lexington and Amoco fosters the purposes of the Act. Amoco argues that, in this case, the perceived inequities between contractors and oil companies, forcing contractors to bear the risk of their principals' negligence, does not exist; therefore, the stated purpose of the Act would not be promoted by its application in this matter. In support of this argument, Amoco notes that Pride purchased more than 85 times the amount of insurance required by the Master Contract, and that Pride is not the type of small "mom and pop" contractor needing protection from Amoco. Rather, Pride is an international company which performs work all over the world and needed the contractual indemnity coverage provided by the Lexington policies for its operations in other states and countries, even in the absence of its contract with Amoco.
However, these factual distinctions do not warrant abandoning the public policy principles that prompted the passage of the LOAIA. As stated by the court in Fontenot, 95-1425 at 8, 676 So.2d at 562, it is the fear of competing contractors that unless they absorb the liability exposure of their customers, like Amoco, they will be excluded from the oilfield market by more customer friendly accommodating competitors, like Pride, who are able to absorb the added costs. Thus, we conclude that voiding coverage in this case will promote the purpose of the Act because it will prevent oil companies from forcing contractors to purchase contractual indemnity insurance coverage. In other words, coverage must be stricken to preserve fairness of competition among oilfield service contractors and to insure against overreaching by their respective customers.[1]

The Marcel Exception to the LOAIA
Having found the LOAIA applicable to the insurance policy in this matter, we must now address Amoco's alternative argument that the jurisprudential exception to the LOAIA first espoused in Patterson v. Conoco, Inc., 670 F.Supp. 182 (W.D.La.1987), and adopted by the United States Fifth Circuit in Marcel v. Placid Oil Company, 11 F.3d 563 (5 Cir.1994) applies and precludes summary judgment. In those cases, an exception to the application of the LOAIA was carved out for instances in which the oil company, and not the contractor, paid the premiums for the insurance coverage at issue. Finding that payment by the oil company for its own coverage fostered the policy of the Act, the court in Patterson stated, "[i]n fact, the acquisition of liability insurance by Dupont [the oil company] is an exercise that should be applauded, not thwarted." Patterson, 670 F.Supp. at 184. In Marcel, the United States Fifth Circuit adopted the exception if the principal pays for its own liability coverage; however, the court was careful to limit the exception, stating, "[i]n approving this exception, however, we stress that the exception does not apply if any material part of the cost of insuring the indemnitee is borne by the independent contractor procuring the insurance coverage." Marcel, 11 F.3d at 570.
We find this limitation precludes the application of the exception to the case at hand. The record reveals, and Amoco does not deny, that the total amount paid by it for approximately 11 million dollars in liability coverage was $2,000: $500, for the primary coverage and $1,500 for excess coverage. Amoco contends, nevertheless, that this payment by it of premium, "bring[s] it squarely within the exception *681 to the LOAIA recognized by Patterson and Marcel."
We cannot agree. Based on the minimal amount of premium paid by Amoco in contrast with the amount of coverage provided, which is clearly inadequate consideration, Amoco has not borne its burden of proving that the material part of the cost of its coverage was not paid by the contractor. Indeed, it appears to us that the cost of covering other additional assureds was incorporated previously in the multimillion dollar premium paid by Pride. This conclusion is further supported by the peculiar fact in this matter that the coverage was procured after the explosion, when the loss known to Amoco and Pride involved a fatality and several other serious injuries. To allow a principal to secure coverage on its contractor's policy after the loss for which the coverage is sought is certainly beyond the intended scope of the LOAIA.
Therefore, for the foregoing reasons, we find defendant is entitled to judgment as a matter of law. There being no genuine issues of material fact, the summary judgment was properly granted in favor of Lexington, dismissing Amoco's claims. Accordingly, that judgment is affirmed. All costs of this appeal are assessed to Amoco.
AFFIRMED.
CARTER, C.J., dissents and assigns reasons.
CARTER, C.J., dissenting.
I disagree with the majority opinion because I strongly believe in the principle of getting what you pay for. Amoco paid Lexington for coverage, Pride paid Lexington for coverage, Lexington agreed to provide coverage and now says it is sorry but there is no coverage because of the provisions of LOAIA (LSA-R.S.9:2780). This is patently and grossly unfair and I submit does not foster the purposes of LOAIA.
I believe that Amoco is correct when it argues that subsection (D)(1) of LOAIA which provides that the provisions therein do not affect the validity of insurance contracts applies in this case. The insurance protection bought and paid for in this case in my opinion does not frustrate or circumvent the prohibitions of the Act. This is not a suit by Amoco against the contractor, Pride.
I respectfully disagree with the majority opinion that voiding coverage in this case "will promote the purposes of the Act" because it will prevent oil companies from forcing contractors to purchase contractual indemnity insurance coverage. The majority opinion erroneously concludes that coverage must be stricken to "preserve fairness of competition among oilfield service contractors ...." In my opinion, the gross unfairness is that Amoco and Pride are not getting what they paid for.
The Lexington insurance policies provided coverage to Amoco under two provisions: the contractual indemnity provisions and the named insured endorsement. The majority opinion errs in applying the LOAIA to void these provisions. There are unresolved issues of fact as to whether the insurance policies are collateral to the Master Contract and whether the LOAIA applies. Secondly, even if LOAIA applies, invalidating the insurance policies will not foster the purposes of LOAIA. Moreover, the facts of this case bring is squarely within the exception to the LOAIA recognized by federal jurisprudence.[1] In Fontenot v. Chevron, 676 So.2d 557 (La.1996), the Louisiana Supreme Court stated:
Does the application of Louisiana's Anti-Indemnity Act to the insurance contract between Hercules and Aetna foster the purposes of the Act? We think not. If bargaining inequities existed *682 between Hercules and Chevron which gave rise to inclusion of the indemnity provision and the waiver of Hercules' and its insurer's subrogation rights in the workover contract, applying Louisiana's Anti-Indemnity Act to the insurance contract in this case will have no effect on these inequities. Applying Louisiana's Anti-Indemnity Act to the insurance contract will not nullify the indemnity clause in the workover contract between Hercules and Chevron, and thus will not accomplish the stated purpose of the Act. Such application would only allow Aetna to escape from a contractual obligation which it voluntarily undertook in exchange for an increased premium.
676 So.2d at 565.
In applying the rationale of Fontenot to this case, I respectfully submit that the trial court's judgment should be reversed. At a very minimum, I submit that the majority opinion errs in prematurely granting the summary judgment from an incomplete record where many material factual issues are in dispute.
Therefore, for the above and foregoing reasons, I respectfully dissent.
NOTES
[1] We are not persuaded by Amoco's argument that Lexington will be unjustly enriched if we apply the LOAIA to void coverage, since Lexington received premiums for the endorsements which it will now not have to honor. The record reveals that, for a mere $2,000 in premiums, Amoco was afforded approximately 11 million dollars in coverage. Furthermore, although not clearly explained by the record, it appears that the endorsements purported to provide Amoco with "after-the-fact" coverage for liability which arose approximately three months prior to the procurement of said coverage.
[1] Marcel v. Placid Oil Company, 11 F.3d 563 (5th Cir.1994); Patterson v. Conoco, Inc., 670 F.Supp. 182 (W.D.La.1987).