**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 99-31150**

---

**CYNTHIA ROBERTS, Etc., ET AL.,**

**Plaintiffs,**

**VERSUS**

**ENERGY DEVELOPMENT CORPORATION;**
**GRASSO PRODUCTION MANAGEMENT, INC.,**

**Defendants - Third Party Plaintiffs - Appellees,**

**VERSUS**

**THE GRAY INSURANCE COMPANY,**

**Third-Party Defendant - Appellant.**

---

Appeal from the United States District Court
For the Eastern District of Louisiana

---

December 13, 2000

Before DUHÉ, EMILIO M. GARZA, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

In this appeal, Third-Party Defendant-Appellant Gray Insurance Company ("Gray") appeals from an adverse summary judgment entered against it in an insurance indemnification dispute among various insurance defendants. The underlying claim giving rise to an insurance payment obligation was the death of Kerry Roberts, who

died when he fell through the top of an oil storage tank which he was repairing. Surviving family members sued both the owner and the production operator of the storage tank, Energy Development Corporation ("EDC"), and Grasso Production Management, Inc. ("Grasso"), respectively. These defendants then filed third-party complaints against Roberts's employer, Production Management Control Systems ("PMCS") and its insurance company, The Gray Insurance Company ("Gray"), seeking indemnity pursuant to the master service agreement between PMCS and EDC. For the reasons discussed below, we reverse the district court's order granting summary judgment in favor of EDC and Grasso.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Kerry Roberts, an employee of PMCS, was killed installing a fire protection device on the top of an oil storage tank owned by EDC when the top of the storage tank collapsed and he fell through and ultimately drowned in the oil stored therein. Roberts was sent to the storage tank by EDC and Grasso, both of which had prior knowledge that the top of the storage tank might be defective since only months prior, a Grasso employee's knee had gone through the top of a companion storage tank. The storage tank at issue was located on EDC's E-5 platform facility in a canal in West Delta Block 83, which is located in Plaquemines Parish, Louisiana. EDC

2

classifies its E-5 platform as an offshore facility but the West Delta Block 83 facility is located in waters within the State of Louisiana.

PMCS limits its services to performing work such as the installation, repair, and testing of safety systems on oil and gas production platforms. The work done on April 29, 1994, the day of the accident, was performed pursuant to a verbal work order issued four days earlier for the installation of a fire safety device on the E-5 tank and platform. The work order was issued from the EDC facility in Plaquemines, Louisiana.

EDC and PMCS had previously entered into a form master service agreement ("MSA") on May 7, 1993, which agreement was prepared by EDC and was quite similar to the MSA entered into by EDC and Grasso. The MSA did not bind EDC to perform any work at all for PMCS and did not identify specific dates, time, or places for performance. The MSA did, though, contain an indemnity provision which required PMCS to carry $1 million in general liability coverage and to designate EDC and EDC's subcontractors as additional insureds. The form MSA also contained a choice of law provision, which provided as follows:

> This Contract shall be governed by General Maritime Law of the United States, wherever permissible. Otherwise, the laws of the State of Texas shall apply, excluding, however, any such law which would direct the application of the law of a different jurisdiction.

PMCS is a Louisiana corporation domiciled in Louisiana and EDC

3

is a New Jersey corporation with corporate offices in Ardmore, Oklahoma. The record reveals that most of the work performed by PMCS was done in Louisiana or in her waters, and a very small portion was performed at a facility in the Outer Continental Shelf in the non-territorial waters offshore of Texas, but none was performed *in* either Texas or her territorial waters.

The insurance provisions of both the EDC/PMCS and the EDC/Grasso MSAs required the contractee's general comprehensive liability policy to provide that EDC be covered as an additional insured under the policy. Each of these entities had general liability policies as follows: PMCS had a $1 million primary policy and a $5 million excess policy, both issued by Gray; EDC's primary policy was issued by Lloyd's for $250,000; and Grasso's primary policy was issued by Lloyd's for $250,000 and it carried an excess policy in the amount of $750,000, also issued by Lloyd's. Both PMCS's and Grasso's excess policies provide that any entity insured under the primary policy is also covered under the excess policy. Undisputedly, each primary policy also contains a provision that a party becomes an additional insured when that status is required by any contract with the named insured. An "endorsement" on the Gray primary policy also contains a schedule of companies to whom primary coverage is to apply. Neither EDC nor Grasso is listed as one of the 27 in the schedule to whom the endorsement explicitly refers.

4

When the Roberts family sued EDC and Grasso for the death of Kerry Roberts, EDC and Grasso filed third-party complaints against PMCS and its insurer, Gray, for MSA contractual indemnification. PMCS denied the third-party claims and asserted in the alternative that if indemnity was owed EDC, it was to be shared with Grasso, and that if additional insured status was declared, it would be shared with EDC's and Grasso's insurers.

The federal district court originally granted summary judgment to PMCS and Gray based on the Louisiana Oilfield Indemnity Act ("LOIA"), La. Rev. Stat. 9:2780, and dismissed EDC's and Grasso's third-party complaints. EDC and Grasso then settled the underlying claims of the Roberts family against them, with EDC paying the family $544,300 and Grasso paying $816,833.75. EDC and Grasso then appealed the district court's dismissal of their third-party claims against PMCS and Gray.

In *Roberts v. Energy Development Corp.*, 104 F.3d 782 (5th Cir. 1997), a prior panel of our Court affirmed the district court's finding that the contract at issue "pertained to a well" and that the LOIA would bar EDC's and Grasso's claims, but it remanded to the district court for reconsideration of the district court's determination regarding the choice of law provision in the MSA. Specifically, the prior panel remanded for a consideration of whether the LOIA rendered unenforceable the agreement's choice of law provision. The prior panel observed that, in a diversity case,

5

the forum state's conflict laws govern resolution of the enforceability of a choice of law provision, and thus, it remanded for consideration of the viability of the agreement's choice of law provisions in light of Louisiana's conflict articles, La. Civ. Code arts. 3540, 3537, and 3515. *See* **Roberts**, 104 F.3d at 786-87.

On remand, the district court concluded that the choice of law provision in the MSA, selecting Texas law, was enforceable and that as a result, the LOIA did not apply. The district court also concluded that while a contractual indemnity clause is otherwise barred by the Texas Oilfield Anti-Indemnity Act ("TOAIA"), Tex. Civ. Prac. & Rem. Code §§ 127.001-127.007 (Vernon Supp. 1996), an "additional insured requirement," like that found in the MSA at issue in this case, does not violate the TOAIA and is valid and enforceable. The court went on to conclude that Grasso's policy would not provide coverage because Roberts was not a Grasso employee. Additionally, the district court ruled that EDC and Grasso would share equally the reimbursement from the $1 million Gray primary policy, that EDC's primary policy would absorb the shortfall after receiving the $500,000 from Gray, and that since Grasso's primary policy had been exhausted by prior claims, Gray's excess policy was to cover the additional liability amount of $316,833.75, which was beyond the $500,000 Grasso would receive from Gray's primary policy. All told, Gray was ordered to pay EDC $500,000 and to pay Grasso $816,833.75.

6

Gray has now timely appealed all adverse rulings made against it by the district court.

## II.  DISCUSSION

### A.  *Standard of Review*

We review the grant of summary judgment *de novo*, applying all of the same standards applicable in the district court.  *See Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1119 (5th Cir. 1998).  Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only if

> . . . the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c).

Here, the material facts are not in dispute and our disposition hinges on the application of the undisputed facts to the law determined applicable.  It is not disputed that should Louisiana law be determined applicable pursuant to the Louisiana conflicts articles, the LOIA would bar any claims against Gray by EDC and Grasso for contribution or indemnity.

### B.  *Analysis*

Pursuant to our prior panel's remand, the district court first set about to reconsider whether the choice of law provision in the MSA between PMCS and EDC, which provision selected Texas law as

7

applying except for those such laws "which would direct the application of the law of a different jurisdiction," was enforceable in light of the LOIA. Pursuant to the remand order, the district court analyzed the enforceability of the choice of law provision under Louisiana's conflicts articles. The district court noted that the decision upon which it had previously relied in determining that Louisiana law governed the dispute, that is *Matte v. Zapata Offshore Co.*, 784 F.2d 628 (5th Cir. 1986), was inapplicable, as noted in the prior panel's remand order, because the holding in *Matte* resulted from the fact that the application of Louisiana law in that case was mandated by the applicability of the Outer Continental Shelf Lands Act ("OCSLA"), which Act the district court concluded is inapplicable to this case because the accident at issue occurred in Louisiana state waters and not on the Outer Continental Shelf.[1]

The district court, therefore, turned to an application of Louisiana's conflicts articles to determine whether the parties' choice of law provision was enforceable. The provisions applicable to the choice of law provision in this case are Articles 3540, 3537, and 3515 of the Louisiana Civil Code. We explained the

---

[1] However, the district court failed to recognize that in addition to concluding that the OCSLA required application of Louisiana law, the *Matte* panel stated that the choice of law provision in that case was also invalidated by the fact that it would have violated the public policy of Louisiana, which state's law would presumably have been otherwise applicable. *See Matte*, 784 F.2d at 631.

8

relevant inquiry under Louisiana law in *Roberts* as follows:

> Under the Louisiana conflicts articles, we look first to Article 3540 which states:
>
> > All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.
>
> La. Civ. Code art. 3540.
>
> Thus, we next turn to Article 3537 to determine which state law would otherwise be applicable to the Agreement. Article 3537 states:
>
> > Except as otherwise provided in this Title, an issue of conventional obligation is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
> >
> > That state is determined by evaluating the strength and pertinence of the relevant polices of the involved state in light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the polices referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.
>
> La. Civ. Code art. 3537.
>
> Article 3515 guides us in balancing the policies of

9

the states:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international system, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

La. Civ. Code art. 3515.

> The Revision Comments to Articles 3515 and 3537 provide helpful instructions to courts using these articles. The Comments emphasize that the objective of the choice of law analysis is to "identify 'the state whose policies would be most seriously impaired if its law is not applied to that issue.'" La.C.C. art. 3515 (1991 revision comments (a)). The Comments to Article 3537 list two steps to follow in making this determination. The first is to identify "'the relevant policies of the involved states.'" The next step is to evaluate "'the strength and pertinence of [these] policies' in light of" the three factors listed in the second paragraph of Article 3537. La.C.C. art. 3537 (revision comments 1991 (d)).

*Roberts*, 104 F.3d at 786-87.

In simplest terms, we must first determine which state's law would be otherwise applicable in the absence of the choice of law provision. We then determine whether application of the chosen law

10

would contravene the otherwise applicable state's public policy. Our overall objective is to determine the state whose policies would be more seriously impaired if its law was not applied, and this is done by comparing the strength and pertinence of the competing states' policies in light of the various factors set forth in Article 3537.

In its assessment of the conflicts articles, the district court concluded that Louisiana's explicit "public policy" against indemnity agreements stated in the LOIA, though strong, was but one of many other factors which guided its decision, and the other factors weighed more heavily in favor of selecting Texas as the appropriate law to govern. The district court concluded that Texas law would otherwise be applicable under Article 3537, and as a consequence, the application of Texas law would not offend any Texas public policy. In making its determination that Texas law would be otherwise applicable under Article 3537, the district court relied on the following factors: (1) both EDC and PMCS had significant contacts with Texas; (2) EDC has its principal place of business in Houston and PMCS maintains a Houston operations office to which all correspondence regarding the MSA was to be sent; (3) the parties contemplated that work orders would be performed in both Louisiana and Texas; (4) the choice of law provision was bargained for by the parties; (5) additional policies of Louisiana encourage the facilitating of multi-state ventures; and (6) the location of the accident was not dispositive. The district court

11

also relied on what it perceived as our implicit recognition of the propriety of selecting Texas law over that of Louisiana based on application of the Louisiana conflicts provisions and in spite of the LOIA in *Americas Ins. v. Apache Corp.*, No.95-31296 (5th Cir. August 12, 1996) (per curiam) (unpublished).[2]  Citing to our unpublished decision in *Americas*, the district court thus concluded that "there is no doubt that Texas law should apply to the underlying agreement between PMCS and EDC."

Gray argues on appeal that the primary inquiry required by Article 3540 is whether application of the chosen state's law would "contravene[] the public policy of the state whose law would otherwise be applicable under Article 3537."  Arguing that Louisiana law would be "otherwise applicable" under Article 3537, Gray asserts that permitting the indemnity arrangement in this case would directly contravene the proviso in the LOIA that "it is the intent of the legislature by this section to declare null and void and against public policy of the state of Louisiana" indemnification agreements requiring defense and/or indemnification of at-fault principals with respect to oilfield accidents.  La. Rev. Stat. 9:2780(A).  In that section, the legislature declared

---

[2]  We pause here to note that the application of the Louisiana conflicts articles in *Americas* involved the consideration of the fact that both parties to the agreement in question were Texas entities.  The *Americas* district court noted in its opinion, which was approved by a panel of our Court, that "Louisiana certainly does not have an interest in protecting Texas contractors from entering into agreements with other Texas entities."

12

that "an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water . . . ." *Id.*

Gray argues that the public policy of Louisiana is clearly and unambiguously stated in the LOIA and there is no explicit statement of the public policy of Texas on any pertinent issue cited by either the district court or the Appellees. Gray cites to ***Cherokee Pump & Equip., Inc. v. Aurora Pump***, 38 F.3d 246 (5th Cir. 1994), in which a panel of our Court noted that unlike the LOIA, the Louisiana Repurchase Statute at issue in that case did not contain an explicit embodiment of state public policy. Gray notes that in ***Matte***, we stated:

> [t]he public policy of Louisiana is clear, certain, and unambiguous. Any provision which purports to provide a defense or indemnity to an indemnitee for claims of injury or death alleged to have been caused by the indemnitee's negligence . . . is 'void and unenforceable.'

***Matte***, 784 F.2d at 631.

It is Gray's position that considering the factors set forth in Article 3537, and the relative strengths of the policies of both Texas and Louisiana, Louisiana has a stronger interest in, and policy for, protecting its sub-contractors like PMCS, from indemnity provisions like the one found in the PMCS/EDC MSA. Gray also argues that considering the verbal work order and not the MSA as the operative agreement even more strongly favors selection of

13

Louisiana, and it points to our prior panel's statement that "[t]he oral work order is the relevant agreement for determining this issue [of whether the agreement pertained to a well]." *Roberts*, 104 F.3d at 784. The oral work order, which originated in and was conveyed to PMCS in Louisiana, called for work to be performed solely on well platforms in Plaquemines Parish, Louisiana. We read *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 315 (5th Cir. 1990) ("if . . . the contract consists of two parts, a blanket contract followed by later work orders, the two must be interpreted together in evaluating whether maritime or land law is applicable."), and *Domingue v. Ocean Drilling and Exploration Co.*, 923 F.2d 393, 396 (5th Cir. 1991) ("[w]e must read the . . . blanket agreement modified by the later work order together as the actual contract."), to require that we look both to the MSA and the work order in conducting our conflict analysis. Article 3537 provides that the governing law is the law of the state whose "policies would be most seriously impaired if its law were not applied to that issue," and that state is determined by weighing the relative strength and pertinence of the competing states' policies.[3] As Comment (c) to Article 3537 explains, the state

---

[3] It is important to note that in Article 3515, the legislature used a broader reference to the term policies of the states, which should not be restricted to consideration of stated "public" policies only. And while we agree with Gray that the Louisiana legislature has no doubt explicitly stated a public policy against indemnity agreements in the LOIA, under Article 3515, we cannot constrain our analysis to consideration of this policy alone.

14

whose law should apply is the state that "in light of its connection to the parties and the transaction and its interests implicated in the conflict, would bear the most serious legal, social, economic, and other consequences 'if its law were not applied' to the issue at hand."

The policies which we must balance are Louisiana's anti-indemnification policy and any countervailing state policies, such as the policy of upholding contracts freely and voluntarily entered into by the parties.[4]  We must evaluate the strength of these policies in light of (1) the pertinent contacts regarding the development and formation of the agreement, the location of the parties, and the location of the performance of the agreement; (2) the nature and purpose of the agreement; and (3) (a) the policies and needs of the interstate system, including the policies of upholding the justified expectations of the parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state (*see* La. Civ. Code art. 3515)[5] and (b) the policies of facilitating the orderly

---

[4]Comment (d) to Article 3537 states that the "relevant [state] policies" which must be weighed "are identified through the resources of the interpretive process by focusing on the specific rules of substantive contract law whose applicability is being urged in the particular case."

[5]Comment (f) to Article 3537 makes clear that:

[t]hrough its cross-reference to Article 3515, clause (3) of the second paragraph of this Article incorporates by reference the list of policies contained therein as well as the analysis prescribed by that Article. . . . [The] relative importance

15

planning of transactions, of promoting multi-state commercial intercourse, and of protecting one party from undue imposition by the other (*see* La. Civ. Code art. 3537).

The district court based its conclusion that Texas law "wins the analysis" primarily on the extent of the parties' contacts with Texas, the fact that the parties contemplated the possibility that work orders would be performed in Louisiana and Texas, and the fact that the choice of law provision was "selected and bargained for" by the parties. The court briefly mentioned the policies stated in the conflicts articles regarding the fostering and planning of transactions and of facilitating multi-state ventures. However, the court did little to compare the relative strengths of each state's respective policies in these regards.

We note the following specific factors which, pursuant to Article 3537, guide our comparison of the states' policies. With respect to contacts of the parties, the district court noted that PMCS had "significant" contacts with Texas, but while PMCS does maintain an office in Houston, Texas, it is in fact incorporated and performs most of its operations in Louisiana. Under the Louisiana conflicts rules, a juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is more pertinent to the

---

[of these polices] will depend on the particular contacts of the enacting jurisdiction, the nature, type, and purpose of the contract, and the particular issue with regard to which there exists an actual conflict.

16

particular issue. *See* La. Civ. Code art. 3518. Under this rule, PMCS is clearly a domiciliary of Louisiana. EDC is incorporated in New Jersey, but claims Houston, Texas as its principal place of business, and it has corporate offices in Oklahoma. Because we feel EDC's Texas office is more closely connected to this dispute, we conclude that it is domiciled in Texas under the Louisiana conflicts rules.

The MSA was signed in Texas and PMCS designated one of its operations offices in Texas for all mailings regarding the MSA in this case, but the great majority of the work contemplated by the MSA was to take place in or offshore of Louisiana. Though the parties contemplated that work might be performed in waters near both Louisiana and Texas, in fact, virtually all work performed under the MSA was performed exclusively in the waters of or offshore of Louisiana. And the specific work order at issue in this case was issued from, to, and in regards to work to be performed in, Louisiana. In addition, the accident giving rise to the insurance obligation occurred in Louisiana, and while this factor is not dispositive, as the district court acknowledged, it is most certainly an important factor, especially where, as here, the sub-contractor whose employee was injured is a Louisiana domiciliary.

We now turn to the policy stated in Article 3515 of upholding the justified expectations of the parties, and the policies stated in Article 3537 of facilitating the orderly planning of transactions and minimizing the adverse consequences that might result from subjecting a party to the law of more than one state. Viewed in light of these policies, the policy stated in the LOIA, which would invalidate the parties' choice of law provision, loses some force against the countervailing policy of upholding contractual obligations freely entered into by the parties. However, with respect to the policy of protecting one party from undue imposition by the other, Louisiana's commitment to protecting its sub-contractors from the "inequity" foisted on such entities by indemnity provisions in work agreements pertaining to wells for oil and gas, is more emphatic than that of any respective policies of Texas. The force of Louisiana's public policy disfavoring indemnity agreements, as stated in the LOIA, is unquestionably very strong. *See* **Matte**, 784 F.2d at 631 ("The public policy of Louisiana is clear, certain, and unambiguous. Any provision which attempts to provide a defense of indemnity . . . is void and unenforceable."). The language of the LOIA makes it clear that Louisiana has a very strong policy against allowing its oil and gas well sub-contractors to be manipulated by well owners and operators who would foist the burden of indemnification on them through work agreements, and subjecting these subcontractors to contrary laws

18

permitting indemnification provisions in other jurisdictions.

Given that one of the contracting parties in this case, PMCS, is a Louisiana domiciliary, that PMCS is the type of oil and gas well sub-contractor for whom the Louisiana legislature specifically contemplated providing protection with the anti-indemnification policy announced in the LOIA, that the nature and purpose of the agreement therefore directly implicate the LOIA policy, that the work order at issue was generated from and pertained to work to be performed exclusively in Louisiana, that the parties' history reveals that virtually all work arranged under the MSA was performed in or offshore of Louisiana, that no work would have been performed under the MSA in the territorial waters of Texas, that the injury giving rise to the underlying insurance obligation occurred in Louisiana, and considering the policy of protecting one party from undue imposition by the other, we conclude that the strength of Louisiana's policy of preventing the adverse consequences which would fall upon its sub-contractors by application of the laws of Texas tips the scales which might otherwise be balanced with respect to each state's policies noted above. We disagree with the district court's holding, that our unpublished, and consequently non-precedential, decision in *Americas* dictates a contrary result under the Louisiana conflicts articles. The *Americas* decision is easily distinguished by the fact that it involved two contracting parties, both of which were

Texas entities.  As the district court noted in that case, "Louisiana certainly does not have an interest in protecting Texas contractors from entering into agreements with other Texas entities."  Thus to sum up, our analysis of the relative strengths of the relevant policies of Texas and Louisiana convinces us that in the absence of the choice of law provision in the PMCS/EDC MSA, Louisiana law would be applicable since its policies for protecting its sub-contractors outweighs any relevant competing policies in Texas.

Having determined that Louisiana is the state whose law would otherwise be applicable under Article 3540, we must now determine whether application of the law selected in the choice of law provision, in this case, Texas law, would "contravene the public policy of" Louisiana.  Our analysis here is brief.  Both parties have agreed that under Louisiana law, the LOIA would void the indemnity provision in the MSA, and the parties agree that application of Texas law permitting indemnification through an additional insured provision like that found in the MSA at issue in this case would contravene Louisiana's explicit and unambiguous public policy against indemnification agreements in any form.[6]

---

[6] We note here that while, even under Texas law, an indemnity agreement is unenforceable as violative of the TOAIA, the Texas Supreme Court has held that additional insured requirements, like that contained in the PMCS/EDC master service agreement, remain viable. *See Getty Oil Co. v. Insurance Co. of North America*, 845 S.W.2d 794, 802-05 (Tex. 1987).  On the other hand, the Louisiana legislature specifically addressed and closed this type of additional insured loophole to the prohibition against

20

Accordingly, we find that the district court committed reversible

_____

indemnification agreements in subsection G of the LOIA which states in pertinent part:

> Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of [the LOIA] . . . which requires waivers of subrogation, *additional named insured endorsements*, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

La. Rev. Stat. 9:2780(G)(emphasis supplied).

Through subsection G, the Louisiana legislature rendered any attempt to procure otherwise prohibited indemnification, through a requirement that an oil services contractor name an oilfield owner or operator as an additional insured under the contractor's insurance policies, unenforceable. Indeed, as the Louisiana First Circuit Court of Appeal recently noted, voiding additional insured provisions "promote[s] the purpose of the [LOIA] because it will prevent oil companies from forcing contractors to purchase contractual indemnity insurance coverage . . . [and insures] against overreaching by [oilfield service contractors'] customers." *Amoco Production Co. v. Lexington Ins. Co.*, 745 So.2d 676, 680 (La. App. 1st Cir. 1999).

We note also that our Circuit has recognized an exception to the LOIA's prohibition against indemnity agreements and additional insured provisions where the additional insured principal pays the portion of the insurance premium incurred by the independent contractor for adding the additional principal to its policy. *See Marcel v. Placid Oil Co.*, 11 F.3d 563, 569-70 (5th Cir. 1994). However, here there is no evidence whatsoever to support application of the *Marcel* exception. There is no evidence that EDC was obligated to pay, or did in fact pay, any portion of PMCS's insurance premiums to Gray for the coverage of EDC as an additional insured. To the contrary, the MSA states in paragraph (4) that "[PMCS] agrees to procure and maintain, at its sole expense, policies of insurance in the minimum amount outlined [in] Exhibit A." The referred to Exhibit A sets forth the insurance requirements which EDC requires of its subcontractors. Paragraph (7) of that exhibit requires that EDC, its subsidiaries, and its employees be named as additional insureds.

21

error in holding that the choice of law provision in the PMCS/EDC MSA was enforceable.

We pause here to briefly address EDC and Grasso's argument that a ruling that Louisiana law applies means that this case must be remanded for trial on the issue of liability. Although we held in *Tanksley v. Gulf Oil Corp.*, 848 F.2d 515 (5th Cir. 1988), that a settlement by indemnitees removes the issue of fault for the LOIA, EDC and Grasso argue that decision has been rejected by several Louisiana appellate courts. Gray responds by noting that we held in *FDIC v. Abraham*, 137 F.3d 264 (5th Cir. 1998) that we should not depart from Fifth Circuit precedent unless the highest court of the state has ruled on the matter.

The remaining issues in this appeal regarding the proper allocation of insurance benefits are moot as a result of our conclusion that the indemnification provision in the MSA is unenforceable against Gray under Louisiana law.

### III. CONCLUSION

For the reasons set forth above, we find that the district court erred in finding that the choice of law provision in the PMCS/EDC MSA was enforceable. And having determined that the choice of law provision is unenforceable, and that pursuant to Louisiana conflicts law, the laws of Louisiana govern this case, we REVERSE the district court's order granting EDC and Grasso summary

22

judgment, and RENDER judgment in favor of Gray.

**REVERSED and RENDERED.**